CAREY, ᴇᴛ ᴀʟ. *v.* MARTIN, ᴇᴛ ᴀʟ.

[No. 382, September Term, 1967.]

*Decided November 27, 1968.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Richard C. Murray* for appellants.

*Eugene P. Smith,* with whom were *M. William Adelson, T. Bayard Williams, Jr.,* and *Andrew E. Adelson* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

The land in this case, like the Low Countries, has been the scene of much controversy. Its recent history is our only concern at the moment. The earlier chapters will be found in *McBee v. Baltimore County,* 221 Md. 312, 157 A. 2d 258 (1960). To expedite comprehension of the facts and circum-

stances we have filed with this opinion a sketch to which, from time to time, reference should be made. (See p. 453, *infra*.)

On 12 January 1965, Martin[1] filed with the Zoning Commissioner of Baltimore County a petition for the reclassification from B.L. (Business, Local) to R.A. (Residence, Apartments) of the 3.3 acre parcel and the reclassification from R.10 (Residence, One-family) to R.A. of the 2.0 acre parcel. Following a hearing on 24 March the Zoning Commissioner, on 31 March 1965, denied Martin's petition. Martin's appeal was heard by the Board of Appeals (the Board) on 7 and 8 June 1966. On 21 December 1966 the Board reversed the Zoning Commissioner and granted the reclassification. The appeal of the protestants (appellants here) was heard by the Circuit Court for Baltimore County on 28 August 1967. The appeal before us is from the order of the Circuit Court, dated 13 November 1967, affirming the action of the Board.

An "unusual feature" of the case, in the opinion of the Board, is that the owner, who proposes to build 101 apartment units if the Board is sustained, presently has the right to build from 69 to 78 apartment units. He could utilize both the R.A. and the B.L. areas for the apartment buildings and the R.10 area for the required parking. It was pointed out, however, that such a use would be aesthetically awkward and undesirable economically.

The Board went on to point out that the 3.3 acre portion "has been * * * zoned B.L. at least since the adoption of the Ninth District Zoning Map on November 14, 1955." At that time, it said,

> "Bellona Avenue was, in spite of its width and curving lines and contours, a major arterial highway used to a great extent by traffic * * * between Baltimore and points north of the subject property * * *. The traffic was extremely heavy at that time * * * overburdening [perhaps] the capacity of the roadway. In 1961 the reconstruction and relocation of Charles Street was completed to the Baltimore County Belt-

---

1. Joseph J. Martin and Kathryn F. Martin, his wife, acquired the property in June 1961.

way, and the Jones Falls Expressway was completed in 1962, which construction removed almost all of the through traffic from Bellona Avenue, and it now has become only a feeder road. * * * In Mr. Thompson's [Joseph D. Thompson, Martin's traffic expert] opinion the construction of the proposed apartments would have a minimal effect and would create no congestion whatever because the present daily traffic on the road is far below capacity. The traffic counts on Malvern Avenue and Ruxton Road are so small as to make no appreciable difference to the situation. Mr. Risa [Justin Risa, appellee's traffic expert] agreed with Mr. Thompson's facts but feared that the extra traffic generated by the proposed apartments, or for that matter any use of this land, might lead to hazardous conditions at the intersections because of the narrowness of Malvern Avenue, and the sight distance from it to the south along Bellona. However, on cross-examination it was brought out in his testimony that the construction of a shopping center, in fact any B-L use, would probably generate more traffic than the proposed apartments. Therefore, the Board finds, as a fact, that if the proposed use were granted and the entire layout, entrances and exits, were prepared subject to approval by the proper authorities, there would be no problem arising from traffic which would warrant any objection to the application for the proposed use."

The Board found there had been "a great number of changes in the neighborhood since the adoption of the zoning map in 1955" in addition to the changes connected with traffic, which in themselves had made the 3.3 acres of B.L. zoning "if not useless, at least undesirable, for a site for any feasible B.L. use;" in fact, Acme Stores had abandoned an option it once had to build a shopping center on the property. The Board cited the testimony of George E. Gavrelis, the Director of Planning for Baltimore County, who testified that the proposed use of the property seemed to be logical because the proximity of commercial development makes it appear to be "appropri-

ately transitional," that the adequacy of nearby commercial facilities makes the present B.L. zoning seem excessive and that there is a need for apartments because of the limited amount of rental housing in the Ruxton-Riderwood area. Reference was made by the Board to the testimony of Frederick P. Klaus, "a qualified realtor and appraiser," appearing on behalf of Martin, who spoke of "changes in the use and occupancy of the roadside business development immediately north of the property," the erection of "a few apartments" on the site of the old Ruxton railroad station and the changes in the road pattern. In his opinion "the proposed use of the subject property would appreciate the surrounding properties * * * [and] the difference between the number of apartments which could be constructed under the present zoning and those proposed would be minimal, and would allow for a much more satisfactory development of the property, both from an aesthetic standpoint and with respect to its impact on the values of neighboring properties." Reference was made also to the testimony of Bernard Willemain, "an experienced land planner" who was familiar with the property and its previous history. In addition to his repetition of the items mentioned by prior witnesses the Board noted Mr. Willemain's recital of the reclassification of the 1.0 acre portion (see plat) from R.10 to R.A. in October 1959, the availability of sewerage since the adoption of the map in 1955 and the continuing "trend for apartments." The Board took note also of his opinion "that the present zoning deprives the owner of a reasonable use of his property; that rezoning the entire property to R.A. is a reasonable solution; * * * apartments would not have any adverse effect on the community or adjoining properties * * *; that the presence of R.10 next to B.L. was unreasonable * * *." There appears to be "no serious dispute as to the availability of utilities, sewer and water."

The Board confessed to an inability to "find anything in the testimony of the protestants to support a decision adverse" to Martin. In this regard the Board said:

"The main trend of the protestants' testimony was that *they would prefer to have this property remain in its*

*present vacant condition,* and feel that any use of this land, of any nature or description, would effect some change in the character of the neighborhood which they describe as 'bucolic'." (Emphasis added.)

The concluding paragraph of the Board's opinion is, in part, as follows:

"This is a case, as in many others, where it is difficult to determine under the facts whether there has been error in the original zoning, or substantial change in the character of the neighborhood, or both. The error, if any, would be based mainly upon the failure of the original zoning authority to foresee or expect the changes which have occurred which have made the present zoning obsolete under any view taken of proper zoning under present conditions. However, even if there were no error the Board finds that the change in traffic, land use, population, and furnishing of utilities, is sufficient almost to require rezoning, and certainly sufficient to support rezoning. * * * "

Appellants seem to agree that their testimony was "well summarized" by the following excerpt, selected by appellants, from the testimony of Kenneth B. Marty:

"Q. Would you tell us why you are here opposing this request. A. Well, basically, it is because I am afraid that these proposed apartments will change the character of this neighborhood, that I have learned to love very much, and it would open up other possibilities. If they have this one change, there will always be the possibility of further change.

"And actually, this area appealed to us, and the one reason we moved out here was the fact that it is unique, to the extent that it has some large estates, and some nice expensive properties, and has some modest homes right next to them. We all get along well, regardless of income status."

The only question before us then is whether the Board's action is supported by any substantial evidence. It is undis-

puted that the construction, in 1966, of the Minebank interceptor relieved the load on the Roland Run interceptor to such an extent that it acquired excess capacity which, of course, became available to serve the Martin property. And as Martin points out, expert witnesses testified that the relegation of Bellona Avenue to the secondary role of handling mostly local traffic and the construction and expansion of large shopping facilities in the Towson area have reduced the need for commercial uses in Ruxton, making his property virtually useless for business purposes.

Martin also emphasizes 4 zoning reclassifications in the neighborhood. The most significant, it is claimed, is the change from R.10 to R.A. of the 1.0 acre lot shown on the plat. Appellants insist that this 1959 rezoning was merely the correction of an oversight. In 1945, it seems, the 1.0 acre lot was changed from Cottage A to Apartment C because the improvements on it were actually divided into several apartments. The comprehensive rezoning of 1955, which changed it to R.10, also changed the 4.1 acres fronting on Bellona Avenue to B.L. In 1959 the Circuit Court ordered the 1.0 acre lot changed to R.A. Martin argues that because the zoning regulations adopted in 1955 permit, in the B.L. zone, any use allowed in the immediately adjoining residential zone, the 1959 change to R.A. made possible an apartment development of at least 69 units and thereby effected a distinct and important change in conditions. A 1.55 acre tract on the north side of Ruxton Road west of Bellona Avenue was changed from R.20 to R.A. upon which were built the Ruxton Township Apartments, clearly visible from the Martin property. There were also several other minor changes from residential to commercial in nearby properties which, Martin claims, further reduced the desirability of his property for commercial use.

Martin advances also, but seems not to press, the argument that because the rezoning of his property is a "zoning up" from commercial to residential use the mistake-change rule does not apply. By imposing additional and more stringent restrictions on his property the police power, he says, has been exercised for the benefit rather than the detriment of the neighbors and since the property has been "zoned up" the change ought to be

upheld without evidence of any change in conditions, citing *Metropolitan Homes, Inc. v. Town Plan & Zoning Comm'n,* 152 Conn. 7, 202 A. 2d 241, 243 (1964).

We considered this proposition in *Board of Zoning Appeals v. Bailey,* 216 Md. 536, 141 A. 2d 502 (1958). Judge Horney, for the Court, said:

> "In Maryland there seems to be no distinction between 'rezoning up' and 'rezoning down.' See Note, 13 Md. L. Rev. 242 (1953). Apparently the same rules with respect to rezoning are applicable regardless of whether the reclassification is to a 'higher' or a 'lower' use. In *Northwest Merchants Terminal v. O'Rourke,* 191 Md. 171, 60 A. 2d 743 (1948), *Kracke v. Weinberg,* 197 Md. 339, 79 A. 2d 387 (1951), and *Bruning Bros. v. Mayor & City Council of Baltimore,* 199 Md. 602, 87 A. 2d 589 (1952), the issue was the validity of a rezoning ordinance classifying land 'upward,' that is, from commercial to residential. The same standards were applied as in the 'rezoning downward' cases. In the *O'Rourke* and *Kracke* cases the ordinance was held invalid. In the *Bruning* case it was held valid. It should be pointed out, however, that in all of those cases it was the property owners within the commercial zone who were protesting the 'rezoning upward.' In the *O'Rourke* case, for instance, the property owner complained that its land was suitable only for commercial use and that it would be unconstitutional to deprive it of this use by rezoning the land residential. The *specific question* as to whether the same rules must invariably be applied in a 'rezoning up' as are normally applied in a 'rezoning down' was not before us in the *O'Rourke, Kracke* and *Bruning* cases. Nor is the question squarely before us in this case, and we leave it open." *Id.* at 541-42.

We shall continue to "leave it open" because, while the question is more nearly "squarely before us" in the case at bar than it was in *Bailey,* we need not consider it since, in our judgment, the action of the Board was not arbitrary, unreasonable

nor capricious. The record reveals evidence sufficiently substantial to support its findings and we cannot say the reclassification was not fairly debatable. *Brown v. Wimpress,* 250 Md. 200, 242 A. 2d 157 (1968); *France v. Shapiro,* 248 Md. 335, 236 A. 2d 726 (1968); *Beth Tfiloh Congregation v. Blum,* 242 Md. 84, 218 A. 2d 29 (1966).

*Judgment affirmed.*
*Costs to be paid by appellants.*