# HABLISTON, ET AL. *v.* THE CITY OF SALISBURY, MARYLAND, ET AL.

[No. 397, September Term, 1969.]

*Decided June 3, 1970.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

*Hamilton P. Fox,* with whom were *Hearne, Fox & Bailey* on the brief, for appellants.

*Walter C. Anderson,* with whom were *Richardson, Rogan & Anderson* on the brief, for The City of Salis-

bury, part of appellees; and by *Victor H. Laws* for Maurice P. Freedlander and Salisbury Brick Co., Inc., other appellees.

McWilliams, J., delivered the opinion of the Court.

Birnam Wood has indeed come to Dunsinane. Appellants importune us to reverse the chancellor, Travers, J., and to set at naught an ordinance of the City of Salisbury reclassifying a 16 acre tract from *"Industrial"* to *"Residential B,"* because, they insist, the change "will depreciate the value of * * * [their residences] and * * * interfere with their use and enjoyment of the same." Perhaps it is just as odd that we think they have the right of it.

The 16 acre tract (the property) lies in a salient of the western boundary of the city. It fronts on Parsons Road which, besides being the southwestern boundary (about one-half mile) of the property, is also a segment of the city line. Its northeastern boundary consists of two ponds separated by an earthen causeway sustaining Mitchell Road which, bisecting the property, intersects Parsons Road. Salisbury Parkway (U.S. 50), completed in 1962, is about 500 feet north of the ponds. Mitchell Road extends only to Main Street, not to the Parkway. The Horace Mitchell property, fronting on Pemberton Drive, and the Parsons property, fronting on Parsons Road, make up most of the northwestern boundary. Efforts to rezone these two properties from "Industrial" to "Residential B" are being contested in other litigation. Fitzwater Street, a property owned by the city, and another owned by a construction company establish the southeastern boundary.

The property is owned by Salisbury Brick Company, Inc. (the company), which for many years used the portion west of Mitchell Road for the manufacture of bricks. The portion east of Mitchell Road was used, until 1948, for the manufacture of cinder blocks. When the comprehensive zoning ordinance was adopted in 1958 the prop-

erty was placed in the industrial classification since, as J. Walter Mitchell the company's president testified, it was "operating as an industrial concern." In 1966 the manufacture of bricks was discontinued "due to the shortage of raw material and [the] scarcity of labor." Demolition of the buildings, begun in 1966, was completed in 1968. Only an office building remains; it was sold to the Parsons Vending Company which, Mitchell concedes, continues to use it for about the same purposes (office, repair shop and warehouse) for which the company used it. Mitchell said he was never able to find a buyer for the property interested in using it for industrial purposes. Nor, it seems, did he try very hard. In 1969 Maurice P. Freedlander, of Baltimore, agreed to buy the property provided the zoning classification could be changed from "Industrial" to "Residential B." He proposes to build garden apartments and town houses, some two stories high, some three stories. The project, described as a "high density residential use," is to be "aimed" at "low to medium income" groups. Freedlander hopes to build about 200 units.

While a number of residents in the neighborhood became plaintiffs in the bill to have the ordinance declared "null and void," only Charles Habliston appeared and testified. The question first to be dealt with is whether he has standing. Freedlander raised the issue in his answer but he did not argue it before the chancellor. The city did not mention standing in its answer but argued it below. Judge Travers' opinion contains no comment in this regard and, of course, he had no finding.

The appellees say, and we agree, that because this is a bill in equity praying a declaration that the ordinance is invalid the plaintiff's allegation of how he is specially damaged by the zoning ordinance must be definite and he must meet the burden of showing such special damage by competent evidence. *Bryniarski v. Montgomery County,* 247 Md. 137 (1967). They argue, of course, that appellants have neither alleged nor proved special damage. We do not see it quite that way. The allegation, the essence

of which is set out in the opening paragraph of this opinion, seems to us to be adequate. *The Chatham Corporation v. Beltram,* 243 Md. 138, 148 (1966). Habliston's property, consisting of a residence, a barn, a few outbuildings and about three acres of land is separated from the property only by Pemberton Drive and the Horace Mitchell lot. The distances from his eastern boundary (Pemberton Drive) to the boundaries of the property range from 200 to 500 feet. He testified that, before he acquired the property in 1967, he made it his business to find out how the brickyard and the Horace Mitchell properties were zoned. He found the zoning to be "Industrial" and he said he "felt * * * [he] could rely on this so-called Comprehensive Master Plan [to] remain unchanged, [and] that * * * [he] could count on it[s] being industrial for some time to come." "Based" on that, he added, he made his "decision to buy the property." He agreed that the number of trucks using Pemberton Drive and Parsons Road to get to the oil tank farms and the concrete plant along the nearby (Wicomico) river was often disturbing. What follows is an excerpt from his cross-examination:

> "Q. And yet you are in the position of a resident fighting for industrial zoning and industrial development?
>
> "A. Yes, sir, right.
>
> "Q. Why is this?
>
> "A. I would prefer, if I had my drathers, not to have either. But if I have to choose between hordes of trucks disturbing my tranquility going by the side of my house as they are now doing, *or putting up with hordes of humans swarming over my property, decreasing its value.* Of the two, I would have to take the trucks. I don't want either, better trucks than *destruction of property values.* [Emphasis added.]
>
> "Q. But the real truth is you don't want either, do you?

"A. I would say yes.

"Q. You would like to see this be a barren buffer zone for your property?

"A. I would say I would like to see the industrial sites similar to the nice plants at Cambridge."

It will be observed, of course, that neither Freedlander nor the city made any attempt to rebut Habliston's testimony in respect of the impact of the proposed reclassification on the value of his property. We think he has demonstrated his standing to maintain the action. In *The Chatham Corporation v. Beltram, supra* at 148, Chief Judge Hammond, for the Court, said:

"Since Beltram's evidence was that he owned property, in which he lived, in close proximity to the reclassified land and had said that from his experience high density and smaller lots depreciated neighborhoods and values — a claim Judge Macgill found plausible—there was no error in the ruling that Beltram had standing to sue."

See also the added comment of Judge Smith who delivered the opinion of the Court in the second *Chatham* case. *The Chatham Corporation v. Beltram,* 252 Md. 578, 584 (1969).

Appellees argue further that any inference of special damage arising out of the close proximity of Habliston's land to the property is rebutted by the fact that this is an *up* rather than a *down* zoning. *Carey v. Martin,* 251 Md. 446 (1968); *Board of Zoning Appeals v. Bailey,* 216 Md. 536 (1958). They assume that, because "Residential B" is a more restricted use, ipso facto, property values in the neighborhood must either increase or, at least, remain unimpaired. It should be pointed out, perhaps, that while we have said an adjoining, confronting or nearby owner is deemed, prima facie, to be specially damaged and that the burden of going forward with contrary evi-

dence shifts to the person challenging the protestant's status, *Bryniarski, supra,* and *Wier v. Witney Land Company,* 257 Md. 600 (1970), we have not yet recognized the availability of such a presumption to plaintiffs in equity cases such as the one before us. Even if it were available it does not follow that "up" zoning benefits everyone. *Carey, supra; Bailey, supra.* In the circumstances of this case and assuming the fruition of Freedlander's proposals, one can readily surmise the likelihood of an erosion in the value not only of Habliston's property but of his neighbors' as well.

We shall proceed now, using a current inelegance, to the nitty-gritty of this dispute. Appellees contend there is in the record enough evidence of both change and mistake to make those issues fairly debatable. *Kirkman v. Montgomery County Council,* 251 Md. 273, 276 (1968). Judge Travers put it this way:

> "It is true, as pointed out in the protestant's brief, that but one witness testified that the original zoning was a mistake. This, I think, is sufficient to raise the question of mistake before the Mayor and Council. Its probative force value may or may not have been nil, but that is the concern of the legislative body. All too frequently a single witness has determined the outcome of a case and it is my belief that it raised a reasonable debatable issue. No more is required.
>
> "With respect to the 'changed conditions,' I find that the record is replete with witnesses testifying to changes which could be substantial. I believe some of the changes suggested by the witnesses as too tenuous to pass a change in zoning upon, but here again, a reasonably debatable issue arises on others."

The "one witness" referred to by Judge Travers must be J. Walter Mitchell, since no other witness touched upon the subject. Mitchell had been a member of the Board

of Zoning Appeals for "six or seven years." He said he came "off of the Board in 1968." He was asked during his direct examination if the "Industrial" classification was proper zoning or "was that a mistake." He thought it was a mistake "because it [the property] had been laying there for ten years and * * * [they] had no prospective buyer for industrial use." On cross-examination he hedged a little. He denied that he said the industrial classification was a "mistake originally," but that it just turned out to be a mistake. He said he did not protest the original classification and he conceded that during his "six or seven years" on the Board of Zoning Appeals he made no "effort to correct the zoning." The following excerpts from his cross-examination are revealing:

"Q. Well, but at that time that it was zoned Industrial, was there any more other zoning classifications that would have been more appropriate?

"A. Well, we were operating as an industrial concern then. I guess not.

"Q. So if you were operating as an industrial concern, it only makes sense zoning Industrial at the time that was originally zoned?

"A. Right."

\* \* \*

"Q. Now, most of the industrial buildings have been removed from this piece of land now, have they not?

"A. Yes.

"Q. Is the land therefore available for residential use?

"A. Yes.

"Q. Is it therefore available for industrial use?

"A. Could be.

"Q. Just as easy one as the other, could it not? You got to remove the building no matter which way you go?

"A. That is right.

"Q. One building is still on it, isn't there?

"A. Yes.

"Q. Is that building being used for anything?

"A. None. It was left there with the idea of the buyer using it as a tool house.

"Q. What kind of building; what kind of construction?

"A. Cinder block building." (Not the office building sold to Parsons.)

We think Mitchell's testimony is a country mile short of being enough to make the issue of mistake fairly debatable.

Although appellees have whipped up quite a froth in respect of the notion there has been a change in the character of the neighborhood, we have inspected the record both carefully and charitably and we have failed to find therein anything of substance in this regard. Indeed it seems to us that the neighborhood today is remarkably like what it was in 1958 when the Comprehensive Zoning was enacted. The record suggests it was then a random and innocuous blend of industrial, commercial, residential and agricultural uses. If the happenings of the past 12 years have had any effect at all upon the neighborhood, they have served only to augment its 1958 character.

Mitchell said he thought the number of residences probably had decreased during the last ten years. George Strott, the company's real estate broker, was asked to point out the closest house to the property that had been built since 1958. His reply was, "Specifically I couldn't point to one house that I know of that has been built close to this property." He did know of two or three a half mile or more distant from the property. Matthew Creamer, the acting director of the Planning and Zoning Commission, which recommended the reclassification, testified that the neighborhood population had increased since 1958 "but not [to] a significant degree." Asked what changes in the neighborhood had occurred since 1958 he said "the most significant change has been the ceasing of the operation of the brickyard * * *." Were there any others,

he was asked. He replied there were "no major ones that * * * [he was] aware of * * * other than [the] construction of U.S. Route 50 to the north," which Alfred Reddish, a lifelong resident, thought was without effect because there was no outlet from Route 50 to Mitchell Road. The director of the Bureau of Inspection, Henry Wojtanowski, stated that, for the period 1 January 1959 to 30 May 1969, his office issued *three* permits to build residences in the neighborhood. All three were for locations in the almost fully developed residential area across the pond to the east of Mitchell Road. During the same period *eleven* permits for industrial construction were issued. He knew of no changes in the character of the area or in the character of the buildings of the area. Merrill Burhans, Creamer's assistant, was asked if he knew of any changes "that would change the character [of the neighborhood] to justify the rezoning." He replied that "the major change in the area has been the abandonment and demolition of the brickyard itself." He knew of no other changes except the establishment of a small food store at the southeast corner of Parsons Road and Pemberton Drive and the Parsons Vending Company's continued use of the office building it bought from the company. Hilary Taylor has conducted a real estate and insurance business in Salisbury for 15 years. From 1935 until 1955 he lived on Main Street just across the pond from the property. He owns property on nearby Hill Street and his mother still lives "right across the pond on the west side of Mitchell Road, almost directly in front of * * * where the kilns [of the brickyard] used to be." We quote from his testimony:

"Q. Have you been familiar with the area in the last ten years?

"A. Yes.

"Q. How frequently are you in it?

"A. Every day, I guess.

"Q. To what extent has there been any residential development in the last ten years?

"A. I don't know of but one dwelling built and that's the one I built a few years back.

"Q. What about the level of industrial activity in the area in the last ten years?

"A. Well, what I have noticed, is not much change in the area in residential or industrial, now, in ten years."

\* \* \*

"Q. [H]as the character of that area changed in the least ten years?

"A. For an area this size, I would say it's changed very little.

"Q. Has there been any change in traffic pattern?

"A. Not that I would notice."

\* \* \*

"Q. Did it [Route 50] stimulate any development in this area one way or the other that you know of?

"A. Not that I know of, other than maybe Salisbury Shopping Center.

"Q. That's on the other side [of Route 50]?

"A. Yes.

"Q. I am talking about the area between Route 50 and say the river.

"A. Not that I know of.

"Q. Did the construction of Route 50 there make any change in the character of this area?

"A. In my opinion, no.

"Q. How about this Mitchell Road? You have always been able to get across the pond on Mitchell Road, haven't you?

"A. Until the time years ago that a bridge through there, washed out.

"Q. Now, the hard surfacing of Mitchell Road, has that made any change in the character of the area that you know of?

"A. Only through possibly more use of vehicles using that particular road.

"Q. Does it dead end at both ends, doesn't it?
"A. Yes.
"Q. It doesn't help you much getting to Route 50, does it?
"A. No."

We shall not undertake a recital of the numerous changes in respect of industrial uses. It suffices to say the record puts it beyond question that there were expansions of a number of existing industrial uses and the establishment of a few new ones. Appellees cited many of these although to what purpose is not clear. As we see it they serve only to emphasize the industrial facet of the neighborhood's character.

Appellees attach significance to the Planning Commission's adoption of the staff report recommending the reclassification from "Industrial" to "Residential B" and the Commission's like recommendation to the City Council. They say we have held that "these reports are 'probative evidence' " which, per se, can make the change issue fairly debatable, citing *Stephens v. Montgomery County*, 248 Md. 256 (1967); *Board of County Comm'rs v. Turf Valley Associates*, 247 Md. 556 (1967). To these we might add *O. F. Smith Bros. Dev. Corp. v. Montgomery County Council*, 246 Md. 1 (1967), and *Martin v. Board of County Comm'rs*, 244 Md. 728 (1967). In a sense this is true but it must not be supposed that such reports, per se, are either inviolate or invulnerable. They are subject to the same analysis and appraisal that other types of evidence must survive to have probative force. The statements of both Creamer and Burhans, his assistant, make it quite clear that there was little, if any, investigation and study of the situation by the staff and that its conclusions do not rise much, if at all, above the level of wishful thinking; in *Board of County Comm'rs v. Oak Hill Farms*, 232 Md. 274, 284 (1963), we said the "staff report dealt largely in abstractions without meaningful specifics." Other than the bland and entirely unsupported assumption of "a change in the character of

the area from industrial to predominantly residential use due to abandonment of the brickyard" there is nothing whatever in the staff report touching upon events or circumstances which might affect the character of the neighborhood. We find absurd the notion that this kind of "tinkling cymbal" should make an issue fairly debatable merely because it was written by the Planning Commission's staff and then made a part of the record before the Council.

Citing *Kirkman, supra, France v. Shapiro,* 248 Md. 335 (1968), and *Bosley v. Hospital for Consumptives,* 246 Md. 197 (1967), appellees suggest that the reclassification of the adjoining Horace Mitchell property from "Industrial" to "Residential B" is evidence of a "substantial change in the character of the neighborhood." Entirely apart from the fact that for many years the Mitchell property had been used exclusively for residential purposes, despite its "Industrial" classification, and that its change to "Residential B" would accomplish no change whatever in the neighborhood's character, the record makes it quite clear that the Mitchell reclassification is presently under attack in the circuit court; obviously, as far as this appeal is concerned, it is a long way from being a fait accompli. In the circumstances this argument lacks merit. The same is true in respect of the argument that, because the brick business has gone down the drain and the buildings have been removed, the character of the neighborhood has thereby been changed. It will be recalled that the zoning application concerns no land other than the company's 16 acres. The decline of the brick business is said to have been the result of a shortage of materials and labor beyond the control of the company and we shall assume that this is a correct statement. However, the removal of the buildings was not brought about by governmental ukase or force majeure but by the voluntary, informed and deliberate decision of the officers of the company for the apparent purpose of facilitating and expediting the sale of the property. We reject the notion that an owner of property merely by discontinuing a use com-

patible with its zoning classification can thereby create a change in the character of the neighborhood sufficiently substantial to make the issue of change fairly debatable.

For some time now we have labored in the shadow of that "strong presumption of the correctness of original zoning" which makes "onerous" the burden of proof facing one seeking a zoning reclassification. We must, therefore, be always mindful, in dealing with that sometimes misty concept, "change in the character of the neighborhood," to be sure that the evidence thereof is evidence of a *substantial* change. *Wells v. Pierpont,* 253 Md. 554 (1969). We are fully persuaded, on this record, that there is no evidence which can be relied upon to make the issue of substantial change fairly debatable and it follows, of course, that the appellees have failed to sustain their onerous burden.

> *Order reversed.*
> *Case remanded for the passage of an order conformable with the views expressed in this opinion.*
> *Costs to be paid by appellees.*