## MORRIS KANFER *v.* MONTGOMERY COUNTY COUNCIL ET AL.

[No. 332, September Term, 1976.]

*Decided May 11, 1977.*

The cause was argued before MORTON, DAVIDSON and MOORE, JJ.

*John J. Delaney,* with whom were *Linowes & Blocher* on the brief, for appellant.

*Nathan J. Greenbaum, Assistant County Attorney,* with whom were *Richard S. McKernon, County Attorney* and *Alfred H. Carter, Deputy County Attorney* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

This unusual zoning case involves a controversial five-acre enclave located among the 1700 acres comprising

Montgomery Village, a Town Sector Zone in Montgomery County. Appellant, Morris Kanfer, received a favorable report and recommendation by the hearing examiner, following an unfavorable report by the Montgomery County Planning Board and its Technical Staff, in connection with his application for a zoning reclassification of the property from R-R (one-half acre) to R-T (Town House). The Montgomery County Council, sitting as a District Council, rejected the recommendations contained in an exhaustive analysis of the application by the hearing examiner and adopted a resolution denying the rezoning. Mr. Kanfer thereupon appealed to the Circuit Court for Montgomery County and in a Memorandum Opinion and Order filed on March 15, 1976, the action of the District Council was affirmed. From that Order this appeal has been taken. Appellant contends (a) that the record is devoid of any legally sufficient evidence which would render the Council's denial "fairly debatable" and (b) that the decision of the Council was not in accordance with legally promulgated procedural requirements. We sustain the first contention and reverse.

I

The facts are essentially undisputed. Historically, the subject property has been in the R-R, or one-half acre zone, since 1958. It was part of a 300-acre dairy farm, the major portion of which was sold to Kettler Bros., Inc., the owners and developers of Montgomery Village, a new town established after the adoption in 1966 of the Town Sector Zone,[1] and consisting of some 1700 acres. The record discloses that the appellant retained this five-acre parcel because of the presence within its boundaries of a well affording pure drinking water for his late wife.

In the Master Plan for Gaithersburg and Vicinity, adopted by the Maryland-National Capital Park and Planning Commission in January 1971, the subject land was recommended for R-90, a one-family, detached, restricted

---

1. Montgomery County Code, § 59-63 (1972).

(one-half acre) residential category. Mr. Kanfer did not participate in the hearings in connection with the adoption of the Gaithersburg Master Plan held before the Planning Commission in July, 1968 and before the County Council in September and November, 1970.

Over the years, the developer of Montgomery Village, with required approvals of the Planning Board and the Council, has constructed an extraordinarily attractive town with a mixture of single and multiple family residential classifications, as well as office and shopping amenities, lakes, a golf course, tennis courts and recreational areas. The following improvements abut the Kanfer property.

### 1) *Maryland Place*

This is a town house community located immediately north of the subject tract, consisting of 33.6 acres with 270 dwelling units (approximately eight dwelling units per acre) and with an average of 24 persons per acre. The southerly end of this development is approximately 35 feet from the northern boundary of the Kanfer property.

### 2) *Thomas Choice*

This is a combination of garden-type apartments and town houses located to the immediate west and north of the subject property consisting of 39 acres and 589 dwelling units (103 town houses and 486 garden apartments). There are between 15.1 and 17.6 dwelling units per acre and a population of between 45 and 53 persons per acre. Thomas Choice is divided into three sections, the first, immediately west of the Kanfer property, consists of 300 apartments; north and west of the first section, there is another area accommodating 186 apartment units, while to the north of the second section there is a development of 103 town houses.

### 3) *Centerway Road*

This is an 80-foot divided four-lane arterial highway which the subject property abuts along its southern

boundary. The property has approximately 470 feet of frontage along this road. There is a median break opposite its intersection with Thomas Farm Road.

### 4) *Thomas Farm Road*

This is a 70-foot arterial roadway along which the eastern part of the subject property has approximately 370 feet of frontage. Thomas Farm Road intersects Centerway Road at the southeastern corner of the property and extends north and west, serving the Maryland Place town house development, from Centerway Road to the southern boundary of the golf course property.

The instant application was filed by the appellant in May 1973, requesting reclassification to either the R-20 (multiple family, medium-density residential) or R-T (town house) zone. (Prior to the hearing before the examiner, the alternative R-20 request was withdrawn.)

In October, 1973 the Montgomery County Planning Board adopted the recommendation of its Technical Staff and recommended denial of the application.[2] The basis for the adverse recommendations were: (a) that the requested rezoning was not in conformity with the 1971 Gaithersburg Master Plan; (b) that the property did not meet the purpose intended for the utilization of the R-T zone; and, (c) although there had been change in the character of the area, such change had been "in strict conformity" with the Master Plan. The Planning Board also cited information provided by one of the opponents to the application, the Montgomery Village Foundation, Inc., and concluded that certain "social implications" militated against the application. These "social" factors related primarily to the recreational and community facilities in the Town Sector Zone which it was believed would "in all probability" not be available to the residents of the Kanfer property for their use.

In early January 1974, a public hearing on the application was held by the hearing examiner for Montgomery County,

---

2. The R-20 alternative request had not at that point been withdrawn.

Stanley D. Abrams. Testimony in support of the application was given by Mr. Kanfer and by a qualified land planner, Werner Kloetzli, Jr. The site plan received in evidence showed a proposed development of 50 town house dwellings (10 units per acre) but the expert's report and testimony with respect to compatibility, compliance with the purpose clause of the R-T zone, impact on traffic and public utilities and related issues, was premised upon maximum development under R-T zoning, namely 12.5 dwelling units per acre. He defined the "neighborhood" of the subject property, a definition which was thereafter adopted by both the hearing examiner and the District Council.

Appearing in opposition to the application were the Citizens Association of Montgomery Village, the Montgomery Village Foundation, and the residents of the abutting Maryland Place town house community. The former contested the application because of its non-conformity with the Master Plan and its alleged in-compatibility with adjacent uses. The members of the Maryland Place town house community were opposed on grounds of alleged overcrowding of school facilities and traffic.

At the conclusion of the hearing, the record was kept open by the examiner for a substantial period to permit inquiries by him to the Planning Board, concerning various aspects of its recommendation. These inquiries were dispatched by the examiner under date of January 10, 1974 and on April 16 following, the Planning Board submitted a lengthy reply. In the course of its communication, the Board made the statement:

> "If the subject property had been part of the Town Sector, it would probably have been reasonable to assume that the property would have been developed similarly in nature and density to surrounding development."

And also:

> "The existing density of the Thomas Choice, Maryland Place, and Court of Whetstone facilities

are probably closer to the R-T Zone than to the R-90 Zone." [3]

Thereafter, on June 12, 1974, the examiner inquired in writing of the Planning Board concerning its conclusion that existing school facilities in the Montgomery Village area were overcrowded, another basis for its adverse recommendation. In reply, by letter dated July 2, 1974, the Board conceded that its earlier conclusion with respect to school impact was erroneous and that "the requested R-T zoning would not seriously impact the school at the elementary, junior or senior high school levels, since new schools will be built in the near future and boundary areas are constantly being adjusted."

Hearing Examiner Abrams filed a comprehensive report on July 22, 1974 recommending approval of the application. In the record extract this report is 28 pages in length and contains a discussion and analysis of the following aspects of the application:

I   —   Compatibility and Compliance with the Purposes and the Requirements of the R-T Zone (15 pages)

II   —   The Master Plan (5 pages)

III   —   The Public Interest (7 pages)

IV   —   Conclusions and Recommendations

Representative of the extreme thoroughness of the examiner's report is the following description of the subject property: [4]

"The subject tract is rectangular in shape, approximately five acres in size and located at the intersection of Centerway Road and Thomas Farm Road within Montgomery Village. The property is

---

3. The Planning Board qualified the above admissions by referring to development densities at more remote locations throughout the 1,767 acres of Montgomery Village, which are outside of the relevant "neighborhood" as defined by the Examiner and Council.

4. The examiner's footnotes are omitted.

undeveloped with a 10 to 12 foot high elevation above Centerway Road while sloping towards and approximately level with Thomas Farm Road. As previously indicated the site is an undeveloped island of R-R zoned property surrounded by land developed in the town sector zone as part of Montgomery Village. It is the only area within the circumferential confines of Montgomery Village that is not zoned in the town sector classification. Immediately to the north of the property is the Maryland Place town house development consisting of 276 town house units of a modern two-story variety. The impact of these town house units upon the subject property is somewhat pronounced in view of the fact that the rear of the closest town house units are only 35 feet (or the distance of the units' back yards) from the subject property without any large intervening open space between the two tracts.

"North of the Maryland Place town house development is the Montgomery Village Golf Course and Country Club. Bordering the Maryland Place town houses to the west is a long, somewhat narrow area encompassing approximately 10 acres between the subject property and the Montgomery Village Golf Course which is utilized as a storm drain swale area. This swale area separates the Maryland Place town houses from the Thomas Choice apartments and another town house development.

"Bordering the western boundary of the subject property is a portion of the Thomas Choice apartment project located on approximately 27 acres of land wherein 300 garden type apartment units (three stories high) have been constructed and occupied with an additional 186 units fronting on Montgomery Village Avenue having received preliminary plan approval from the Montgomery County Planning Board. Directly north of the

undeveloped area which has received approval for 186 garden apartment units there are approximately 11 acres of land wherein 103 town house rental units have been constructed. This town house area also borders the southern edge of the Montgomery Village Golf Course. Three-story apartment units also have an impact on this site due to the close proximity of the apartment units to the subject property (approximately 60'), again without significant buffer areas between the units and this property.

"Directly west of the existing Thomas Choice apartment project bordering on the northeast quadrant of Montgomery Village Avenue and Centerway Road there is a large undeveloped area which is proposed for development as a church site. To the west of the church site across Montgomery Village Avenue there exist two service stations which form the northernmost portion of the Montgomery Village Community Shopping Center which houses a variety of convenience and service commercial uses and sizable off-street parking areas. This community commercial facility is approximately one quarter of a mile west of the subject property.

"Directly to the east of the applicant's tract across Thomas Farm Road is the newly constructed Whetstone Elementary School on approximately 8.8 acres of ground. Also on the east side of Thomas Farm Road is a portion of the dwelling units within the Maryland Place town house community. To the east of the Whetstone Elementary School and also on the north side of Centerway Road is the future site of the proposed Stewartown Junior High School which is physically outside of the confines of Montgomery Village and is currently zoned R-R.

"South of the subject property and immediately across Centerway Road is a part of the Courts of Whetstone residential community containing in

this section 65 unusual court houses which resemble detached homes on completely walled lots fronting on parking court areas. The rear yards of these homes abut Centerway Road and face the subject property as well as the Thomas Choice garden apartments. The residents of these homes are somewhat buffered from the effects of traffic on Centerway Road as well as visibility of the subject property and the adjoining garden apartment area by virtue of a sizable earthen mound bordering the southern perimeter of the road which is further improved with large substantial pine trees planted at the top of this mound area. In addition, the walls which appear to be at least six feet high provide a further sight and sound barrier and insure privacy within each individual unit. These court type houses, while somewhat resembling large town houses, are not attached in a common row fashion but are generally separated by the patio or garden walls surrounding each individual property. To the west of this portion of the Courts of Whetstone community is the Whetstone Professional Center which is an attractive area of two-story professional office buildings sited somewhat below road grade to minimize visual impact.

"To the immediate west of the above described section of the Courts of Whetstone and also fronting on the south side of Centerway Road is the Whetstone Community Recreation Center consisting of several tennis courts, community swimming pool, playground area, club house and parking lot. The Whetstone Community Recreation Center and its facilities are available only to those residents of the Courts of Whetstone as well as the larger Whetstone community of single-family detached homes to the south to approximately the vicinity of the Lake Whetstone. To the east of the Whetstone Community Recreation Center are [sic]

an 40 units within the Courts of Whetstone community consisting of the same types of homes, location and layout as described previously."

With respect to "neighborhood", the examiner rejected the suggestion of the opponents that the entire 1700-acre Montgomery Village Town Sector constituted the appropriate definition. Instead, he agreed with appellant's land planning consultant who had defined the neighborhood of the property as an area bordered on the north by the southern perimeter of the Montgomery Village Golf Course, on the west by Montgomery Village Avenue, on the south by the southern boundaries of the Whetstone Professional Center, the Courts of Whetstone, and the Whetstone Community Center, and on the east by the eastern boundary of the proposed Stewartown Junior High School site. (This constitutes generally the areas involved in the examiner's above quoted description.)

The examiner rejected the contention of the opponents that there were problems of "social implications" involved in connection with the use of recreational facilities by residents of the Kanfer tract and agreed with the applicant that the matter was one of appropriate policing by the private community recreational facilities involved. The ultimate conclusions and recommendations made by the examiner were threefold:

1. "The requested reclassification would result in a form of development compatible with existing and planned land uses in the surrounding area and would comply with the purposes of the R-T Zone as stated in the Zoning Ordinance.

2. "The requested reclassification to the R-T Zone, although not in strict accord with the land use recommendations contained within the Gaithersburg and Vicinity Master Plan, is not antithetical to the purposes of that Plan and would provide a more logical land use proposal considering present and proposed development

within the neighborhood than the zoning category currently recommended in the Plan.

3. "The grant of the subject application would not be adverse to the public interest."

On October 29, 1974, the Council adopted a resolution denying the application. In an opinion which accompanied the resolution, the Council adopted the examiner's (and appellant's) definition of "neighborhood" but disagreed with the examiner's conclusions and recommendations. The Council rested its decision upon the following statements:

(a) the proposed R-T development would · cause density increases in the neighborhood not anticipated or planned for at the time of the approval of the surrounding Town Sector Zone;

(b) approval could establish the undesirable precedent of permitting enclaves located within Town Sector neighborhoods to develop at increased densities over that designated and planned for the enclave property;

(c) the application was not in conformity with Gaithersburg and Vicinity Master Plan which recommends the R-90 classification. The population generated by the recommended R-90 development would be compatible with the surrounding Town Sector densities;

(d) The Technical Staff of the Planning Board of the Maryland National Capital Park and Planning Commission recommended denial, and the Council agreed with their recommendations and further agreed that the application would not further the purposes of the R-T zone;

(e) there is a current sewer moratorium in the area and therefore the subject property could not presently be serviced by public sewer;

(f) it appears from the evidence that the senior high school servicing the area is presently

overcrowded and that the pupils generated by R-T zoning on the site could be absorbed only when the new schools, then only in the planning stages, were constructed;

(g) the grant of the application would be adverse to the public interest because the public facilities proposed were planned on the basis of the applicable density in the zoning category recommended for properties in the area.

The action of the County Council, sitting as a District Council, was thereafter affirmed by the Circuit Court in a Memorandum Opinion and Order filed on March 11, 1976. In its Memorandum Opinion, the court (McAuliffe, J.) noted that the case involved a request for a reclassification to a "floating" zone and that although the traditional "change-mistake" standard was not applicable, appellant nevertheless had the burden of proving to the District Council that:

"1. The reclassification complied with the express purpose provisions of the [zoning] ordinance [Montgomery County Code, (Sec. 59-44)], and

2. The proposed use was compatible with the existing and planned land uses in the surrounding area, and

3. That the proposed reclassification was not adverse to the public interest."

With respect to these issues, the court observed:

"If the record discloses legally sufficient evidence which generates a fairly debatable issue as to any of the three elements, the decision of the District Council must be sustained for zoning is a legislative, and not a judicial function. Our review of the record convinces us that fairly debatable issues are generated as to at least the first and second elements, and we shall therefore affirm the action of the District Court.

"Plaintiff and the zoning hearing examiner make a very persuasive case for the grant of this application, and we find the evidence of record would certainly have supported such action. Unfortunately for Plaintiff it does not follow that because zoning could lawfully be granted, it must be granted. Nor is it of any significance that this member of the Court may be persuaded that the better course would be to grant the application, for the Court is not permitted to substitute its judgment for that of the District Council."

As for the adjacent uses, the court found:

"Clearly, the grant of R-T zoning would be 'appropriate' and 'compatible' with respect to the neighbors to the north and to the west, for here we find town houses and garden-type apartments. So also, there would appear to be no problem to the east, for here we find an elementary school. *We think therefore, that the stumbling block was probably the development to the south, and for the reasons we have stated, we find this to have been a legitimate consideration of the legislative body.*" (Emphasis added.)

## II

The R-T zone has been held to be a "floating zone" as distinguished from the standard Euclidean zone.[5] The Maryland "change or mistake" rule is inapplicable. *Knudsen v. Montgomery County Council,* 241 Md. 436, 441, 217 A. 2d 97, 100 (1966). Such a zone is in the nature of a special exception and, as Judge Barnes stated in *Aubinoe v. Lewis,*

---

**5.** See Beall v. Montgomery County Council, 240 Md. 77, 90, 212 A. 2d 751, 758 (1965) where the court cited the article of Professor Reno of the University of Maryland School of Law, 23 Md.L.Rev. 105, entitled "Non-Euclidean: The Use of the Floating Zone." As the court observed, the author points out that the floating zone is a "new concept" in zoning and "frees the legislative body from the shackles of the conventional Euclidean zone" fixed as to definite areas. *Id.*

250 Md. 645, 652-53, 244 A. 2d 879 (1968) (speaking of another type of floating zone, namely, R-H):

> "the vital and decisive determination by the District Council is whether the application complies with the expressed purposes for which the accomplishment of this floating zone was established. These purposes are designed to insure that this floating zone is compatible with the other existing uses in the general neighborhood of the property for which R-H zoning is sought."

The purposes for which the R-T zone was established are expressly stated in the Zoning Ordinance, as follows (§ 59-44):

> "The purpose of the R-T zone is to provide suitable sites for town houses:
>
> (1) In sections of the county that are *designated* or *appropriate* for multiple-family residential development at densities of 12.5 units or more per acre; or
>
> (2) in locations in the county *where there is a need for buffer or transitional uses* between commercial, industrial, or high density apartment uses and low density single-family uses." (Emphasis added.)

The objectives of the zone are further explicated in the following language:

> "It is the intent of the R-T zone to provide the maximum amount of freedom possible in the design of town houses and their grouping and layout within the areas classified in that zone, to provide in such developments the amenities normally associated with less dense zoning categories, to permit the greatest possible amount of freedom in types of ownership of town houses and town house developments, to prevent detrimental effects to the use or development of adjacent properties or the neighborhood and to promote the health, safety,

morals and welfare of the present and future inhabitants of the district and the county as a whole."

And the Ordinance specifically provides that no presumption is created by virtue of compliance with its requirements:

"The fact that an application for R-T zoning complies with all specific requirements and purposes set forth herein shall not be deemed to create a presumption that the resulting development would be compatible with surrounding land uses and, in itself shall not be sufficient to require the granting of the application."

On an appeal from the grant or denial by the legislative body of an application for a zoning reclassification, the function of the reviewing court in Maryland is indeed restricted and the "fairly debatable" rule is applicable. Otherwise stated, the appellate court may not substitute its judgment for that of the zoning body and should affirm when the latter's decision is supported by substantial evidence. *Bosley v. Hospital for Consumptives*, 246 Md. 197, 204, 227 A. 2d 746, 750 (1967). At the same time the Court of Appeals has consistently ruled that the denial of a zoning application may be reversed by an appellate court when the action appealed from is shown to be "arbitrary, capricious or illegal." *Agneslane, Inc. v. Lucas*, 247 Md. 612, 619, 233 A. 2d 757, 761 (1967); *County Council v. Gendleman*, 227 Md. 491, 498, 177 A. 2d 687, 690 (1962).

On the basis of our review of the record and exhibits in this case, we conclude that the lower court construed the evidence too narrowly. The subject property is completely surrounded by apartments, town houses and arterial roadways. The refusal of the Council to reclassify it from single family, one-half acre residential to the town house classification was indeed arbitrary and capricious.

Before proceeding to a consideration of the reasons assigned by the Council for its action, we observe that the lower court, although apparently of the view that "the better

course would be to grant the application," declined to enter a reversal primarily because the Council found that the development immediately to the south was a "stumbling block." The court was here referring to the Courts of Whetstone, a rather unique assembly of 65 dwelling units located *across Centerway Road,* generally opposite the Kanfer tract. While these are detached single family houses, they are located very close together, as described by appellant's planning expert, "on lots which are not much wider than the houses. They have walled patios away from the court-side of the town houses . . . . The courts, physically speaking, are driveway areas with parking and garages facing — parking within them and garages facing them. Opposite the courts, the houses all have walled patios surrounding them."

It is readily apparent that this development is not to be equated with single family residential in the conventional sense. But more fundamentally, the Courts of Whetstone are located across an arterial highway, from the subject property — a natural barrier — and are already confronted by the Thomas Choice garden-type apartments abutting Centerway Road, north and west of the five-acre tract involved in this case. The Thomas Choice apartments have a density of 15.1 to 17.6 dwelling units per acre. Again, as appellant's land planner correctly pointed out, "the court houses and the garden apartments are approved, compatible uses on opposite sides of the Centerway Road." We agree with appellant that the Council displayed a total lack of consistency in holding that the R-T development on the subject property would not be compatible with the Courts of Whetstone when adjoining multi-family development has been recognized as compatible. Appellant's proposal is for lower density town houses (with a maximum density of 12.5 units per acre). We fail to perceive how the Courts of Whetstone could present to the Council a "legitimate and reasonable stumbling block" to the grant of appellant's application.

With respect to the developments on the same side of Centerway Road and to the north, east and west of the

subject property, it is beyond reasonable contention that the proposed R-T reclassification would be wholly compatible with existing and planned development. As the lower court pointed out with respect to these locations:

> "Clearly, the grant of R-T zoning would be 'appropriate' and 'compatible' with respect to the neighbors to the north and to the west, for here we find town houses and garden-type apartments. So also, there would appear to be no problem to the east, for here we find an elementary school."

We now examine *seriatim* the statements made by the Council in support of its resolution of denial.

### 1. *Claimed Incompatibility*

What has just been stated is, of course, referable to this issue. In addition, we observe that after careful study and consideration of the "neighborhood" involved, the examiner held that the "densities permissible under the R-T zone (are) entirely compatible and appropriate in terms of existing and planned densities within this neighborhood area. . . . The subject application would permit densities either in terms of dwelling units or population which squarely fit between the densities experienced in the two abutting communities and overall density experienced north of Centerway and east of Montgomery Village Avenue." The Council's only basis for rejecting this finding was its conclusory statement that the proposed R-T development was not compatible in that it would cause density increases in the neighborhood "not anticipated or planned for at the time of the approval of the surrounding Town Sector zoning"; and its expressed apprehension that a grant of the application would establish an "undesirable precedent."

The hearing examiner made a finding — which we consider fully supported — that the density effect of the proposed reclassification would be "minute." In his language, "What conceivable impact could the additional 20 or 30 persons per acre by virtue of R-T, as opposed to R-90,

development have, when considered in the course of and spread throughout the 1700 acre development area in the same fashion that densities are not calculated under the Montgomery Village Town Sector plan?"

In any event, density *per se* would not be a valid reason for the denial of the application, unless the District Council could reasonably have found that increased density caused adverse impact upon public facilities such as roads, schools and utilities. The record is devoid of evidence reflecting such impact. Accordingly, we conclude that the Council's findings that the application was not compatible "with surrounding land uses and densities" is an unsupported assertion and is contradicted by overwhelming evidence to the contrary.

### 2. *Gaithersburg Master Plan*

The Technical Staff of the Planning Board, the Planning Board itself and the District Council all adverted to the nonconformity of the instant application with the Gaithersburg and Vicinity Master Plan of 1971, recommending the R-90 zone category for the Kanfer property. The lower court also made reference to this aspect of the case and observed that while this fact alone might not have been sufficient to deny, the Council was at liberty to consider it together with other "relevant factors in reaching its ultimate decision."

First, we observe that the Technical Staff misstated in a memorandum to the examiner the significance of a Master Plan when it wrote that such a plan is entitled to a "strong presumption of correctness." As the examiner correctly pointed out in his report and recommendations, the established rule in Maryland is that a Master Plan is at best a "flexible guide" or an "intellectual prophecy" of future development. *See Pattey v. Board of County Commissioners*, 271 Md. 352, 360, 317 A. 2d 142, 146 (1974); *Aspen Hill Venture v. Montgomery County Council*, 265 Md. 303, 314-15, 289 A. 2d 303, 309 (1972). Furthermore, in citing the Master Plan recommendation as one of the reasons for its decision, the Council ignored evidence of record which disclosed that subsequent to the adoption of the Master Plan in January

1971 by the Planning Board, that Board approved record plats on abutting properties permitting apartments and town houses within 53 feet and 35 feet, respectively, of the subject property — and with no buffers in between. Again, the Planning Board, as previously pointed out, felt compelled to acknowledge subsequent to the hearing that the density of existing, abutting uses was "probably closer to the R-T zone than to the R-90 zone," and that had the subject property been part of the surrounding Town Sector it would be "reasonable to assume" that it would have been developed "similarly in nature and density to surrounding development." In our judgment, of greater relevance than the fact of nonconformity with the Master Plan was the question whether the R-90 designation was a reasonable and suitable proposed land use in the light of facts and circumstances known to the Council at the time of its consideration of the application on October 29, 1974.

Two final considerations remain with respect to the Master Plan issue. First, the fact that appellant did not appear in opposition to the proposed Master Plan at hearings before the Planning Board and the Council, is irrelevant. Mr. Kanfer testified that he was unaware of the pendency of the proposed plan. There is no evidence that as a property owner he received notice of any hearings and no such claim is made by the County Council in this case. *See Schroeder v. City of New York,* 371 U. S. 208 (1962). At all events, however, we know of no authority for the position that participation either for or against a proposed master plan by an interested property owner should have any effect upon a subsequent application for reclassification of his property. Finally, in weighing the validity of the recommendation of the 1971 Master Plan, it should be noted that appellant may not, under the provisions of the Zoning Ordinance, legally apply for Town Sector zoning. Section 59-63 (e) permits only the original applicant for Town Sector zoning or a successor in title to add to an existing Town Sector.[6]

---

6. Appellant also contends, with some persuasiveness, that he is between a "rock and a hard place" in that the Maryland "change-mistake" rule would even seem to preclude a successful application for the R-90 zoning recommended in the Master Plan.

### 3. *Adverse Recommendations of Technical Staff and Planning Board*

It is fundamental that reports and recommendations of governmental planning agencies are neither "inviolate" nor "invulnerable." *Habliston v. City of Salisbury*, 258 Md. 350, 361, 265 A. 2d 885, 891 (1970). As the Court of Appeals there noted, such reports are subject to the same analysis and appraisal as other types of evidence in order to have probative force. Here, the County Council relied upon the Board's report and recommendations, citing overcrowded conditions in junior and senior high schools in the area as a basis for denial. The record clearly shows, however, that although the Board initially made this finding, upon further consideration of the matter, subsequent to the hearing, in answer to further inquiries from the hearing examiner, the Technical Staff withdrew from its previous position and conceded that the requested rezoning would not "seriously impact" schools at the elementary, junior or senior high school levels because new schools would be built and school boundary areas are "constantly being adjusted."

The adverse recommendation of the Planning Board based upon "social implications" also indicates that the report falls short of accepted standards. This aspect of the report resulted from claims of opponents to the application — residents of Montgomery Village — that certain of the recreational facilities are limited to Town Sector residents. Problems would result, it was claimed, if town house owners and their families on the subject property attempted to use such facilities.[7] As the hearing examiner correctly held, these so-called "social implications" should have claimed no part of the Board's report. At all events, the report inconsistently overlooked that nonmembers would also be generated if the subject tract were improved in the recommended R-90 zoning category.

---

7. Appellant met this contention at the public hearing on the application by the introduction of evidence disclosing that a number of golf and swimming facilities existed in Montgomery Village which are not limited to members of Citizens' Associations and that school sites in the area afford recreational facilities for both members and nonmembers alike.

### 4. *Purposes of the R-T Zone*

In its opinion and resolution of denial the Council accepted and followed the unsupported conclusion of the Planning Board that the application "would not further the purposes of the R-T zone." These purposes have earlier been quoted. At the hearing, appellant's land planning expert testified that principal reliance was placed upon Section 59-44 (1) — that the purpose of R-T zoning is to provide suitable sites for town houses in "sections of the county that are designated or appropriate for multiple family residential development at densities of 12.5 units or more per acre"; and that, of course, in the instant case the subject property while not "designated" was "appropriate" for such development. In sharp contrast to the bald assertion made by the Council in its resolution is the careful and painstaking examination by the hearing examiner of the types of development together with their densities of the areas abutting and surrounding the subject property. The Council's finding that the application would not further the purposes of the R-T zone is totally unsupported. The appropriateness of the proposed reclassification, in the light of existing surrounding uses, is very plain.

### 5. *Sewer Moratorium*

Another stated basis for the Council's denial of the requested rezoning was that "there is a current sewer moratorium in this area, and the subject property cannot be presently serviced by public sewer."

The uncontroverted evidence before the examiner was that existing sewer and water lines service the Thomas Choice, Maryland Place and Courts of Whetstone communities surrounding the tract, as well as the Whetstone elementary school. The examiner went on to state:

> "The property is situated in the Seneca Drainage Basin which is under both Washington Suburban Sanitary Commission and State Health Department sewer moratoriums. The Sanitary

Commission reports that there is no sewer capacity available in the Seneca Basin at this time and no sewer connection could be provided to the site until such moratoria were lifted. The subject property however is in Sewer Service Category I in the Montgomery County Ten-Year Sewer Plan. The Sanitary Commission projects that maximum theoretical development of this tract in the R-T Zone would increase sewage flow in the drainage basin by some 25,750 gallons per day. However, as previously stated, there is no evidence from the Sanitary Commission or any other source to indicate that the sewer lines in the immediate area are either overcapacity [sic] or defective and would present some immediate health hazard. *Likewise, it cannot be contended that rezoning at this time would be premature on the basis of the lack of available public sewer or water lines in the immediate vicinity, since such lines presently serve all existing development surrounding this property.*" (Emphasis added.)

Clearly, the facts here do not present a case where rezoning would necessitate extension of sewage and other public facilities into altogether undeveloped areas. This is not a case where denial of rezoning might be justified on grounds of public expense. *See Gorin v. Board of County Commissioners*, 244 Md. 106, 111, 223 A. 2d 237 (1966). Furthermore, occupancy of homes developed from the appellant's property would be as much as two years subsequent to the issuance of permits and the county, of course, is in a position to control development by withholding permits pending the temporary sewer moratorium.

Finding, as we do, that the fairly debatable rule is not applicable under the facts of record in this case and that the Council's action was arbitrary and capricious, it is unnecessary to consider appellant's further argument that

the Council failed to comply with the requirements of Section 59-207 (a), Montgomery County Code 1972, and that it improperly acceded to a plebiscite in denying the application.

> *Order reversed; case remanded to the Circuit Court for Montgomery County for remand to District Council for adoption of a resolution granting application # F-914 for amendment to zoning ordinance map; appellee, Montgomery County Council, to pay the costs.*