BEALL, ET AL. *v.* MONTGOMERY COUNTY COUNCIL, ET AL.

[No. 395, September Term, 1964.]

*Decided August 27, 1965.*

*Motion for rehearing filed September 27, 1965, denied October 12, 1965.*

The cause was argued before HAMMOND, HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*William F. Hickey* for appellants.

*Lawrence E. Speelman, Assistant County Attorney,* and *Hal Lackey,* with whom was *Robert G. Tobin, Jr., County Attorney for Montgomery County,* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

On May 28, 1962, Jack Kay, et al, as owners of 43.2579 acres of land in Montgomery County, Maryland bounded by the Washington Beltway, Colesville Road and University Boulevard East (the subject property), filed an application with the Montgomery County Council, acting as the District Council, (County Council) to rezone the subject property from

an R-60 zone (one-family, detached residential, with a minimum lot area of 6000 square feet) to an R-H zone (multiple-family, high-rise planned residential). The Montgomery County Capital Park and Planning Commission (Planning Commission) and its Technical Staff recommended that the application be approved. After due notice, a public hearing was held before the County Council which approved the requested rezoning for 41.6 acres, withholding 1.6 acres for future road construction. An appeal from the approval was perfected by various neighboring property owners to the Circuit Court for Montgomery County. That court, after a hearing, affirmed the reclassification and dismissed the petition. Judge Anderson filed a well-considered memorandum opinion in the case.

The subject property was the northerly portion of the Old Indian Spring Country Club, Four Corners. It is now unimproved by buildings and is overgrown with natural vegetation, but many evergreens and deciduous trees, which were planted when the subject property was used as a golf course, still remain. The subject property has a gently rolling terrain which slopes toward the southeast. It is triangular in shape and is entirely surrounded by three large improved dual-lane highways. On the north and east is University Boulevard East, on the south is the Capital Beltway and on the west is the Colesville Road. At the easterly end of the subject property—the apex of the triangle—is an elaborate interchange between the Capital Beltway and University Boulevard East. At the southwesterly end of the subject property is an elaborate interchange between the Capital Beltway and the Colesville Road. To the north of the subject property, between the east and west bound lanes of University Boulevard is a large brick Methodist Church, Marvin Memorial Methodist Church, and a gasoline filling station. To the northeast of the Capital Beltway is Saint Bernadette's Roman Catholic Church, School, Rectory and associated buildings. Both of these churches are separated from the subject property by the roads mentioned. The other surrounding properties are, for the most part, one-family detached residences. It will be seen that the subject property is an "island" completely surrounded by major highways and completely separated from the one-family, detached residences lying to the south, west and northeast of that property.

The subject property for a number of years was in the R-60 zone. On February 13, 1962, the County Council created and added to the Montgomery County Code a new type of zone, known as the R-H zone.[1] The purpose of the establishment of the new R-H zones is stated in the ordinance as follows:

> "The purpose of the R-H Zone is to provide suitable sites for relatively high density residential development, to accomplish economies in the construction and operation of such public services as transportation, retail shopping facilities, and other community facilities which depend upon convenient access by residents of the area, and so as to prevent undue congestion in sections of the County where such facilities are not available or cannot be conveniently and economically provided. These sites will provide a maximum of light, air, and open space, for the benefit of the residents of the development and for the surrounding area. Within the limits of these requirements, it is the purpose of the R-H Zone to provide the maximum possible amount of freedom in the design of residential structures and their grouping and layout within the areas classified in that zone; to prevent detrimental effects to the use or development of adjacent properties or the general neighborhood; and to promote the health, safety, morals, and welfare of the present and future inhabitants of the district and of the County as a whole."

The uses permitted as a matter of right include a business office in a multiple-family or multiple group dwelling, operated in connection with the rental, operation, service and maintenance of the dwelling; churches, convents, monasteries and other places of worship; dwellings, one family detached; dwellings, multiple-family and multiple group; farming and other agricultural uses; libraries, museums, and similar institutions

---

1. Montgomery County Code, 1962, Section 164-0 and 104-13A; see Laws of Montgomery County, 1962, page 131; the ordinance is No. 4-124, adopted February 13, 1962.

of a noncommercial nature; off-street parking of private automobiles in connection with the permitted uses; public and government operated buildings, and public parks, playgrounds and other recreational uses; and, private swimming pools as an accessory use. By a special exception, the following uses may be permitted:—apartment hotels; retail sales and consumer service establishments incidental to a multiple-family structure or apartment hotel on a site of not less than 20 acres and limited to drug stores, restaurants, beauty shops and other like uses and under certain definite limitations as to use and operation; home occupations, medical or dentist offices under definite limitations as to location, operation and parking facilities; and, public utility buildings but not including above ground transmission lines and radio and television broadcasting stations and towers.

There are many restrictions in the new R-H zone and they are stringent regulations. There must be a minimum width of 200 feet at the front building line. The minimum net lot area per dwelling unit is provided on a graduated scale with a low of 1000 square feet for 8 multi-family dwellings, or less, to 1400 square feet for more than 11 but not more than 12, but it is provided that in no case shall coverage exceed 12% nor be less than 1000 square feet of net lot area for each dwelling unit.

In regard to yards, it is provided that the minimum front, side and rear yards are generally 30 feet for buildings not more than 30 feet in height with a provision for the increase by one foot for each foot the height of the building exceeds 30 feet. Between multiple-family dwellings a distance of 50 feet is required and this distance also increases one foot for each foot the taller building exceeds 30 feet. Off-street parking is required as set forth in Section 104-20 of the Montgomery County Code, that is, as applied to the proposed project, 1½ parking spaces for each residential unit. Not less than 55% of the net area used for multiple-family or multiple-group dwellings must be devoted to green areas as defined in the ordinance, and these green areas must be maintained in good condition. There are restrictions on lighting to protect "abutting or facing premises."

To obtain a building permit or a certificate of occupancy under the new R-H zone, the applicant must submit "a plan of

development" to the Department of Inspection and Licenses which in addition to the usual information required:—

"* * * [S]hall show, * * * the location and height of all buildings and structures; the area devoted to parking facilities and accessory buildings; all access roads and drives; the topography and major vegetation features now existing on the land; the proposed grading, landscaping and screening plans, recreation, outdoor living, and other green areas; and such other features necessary for the evaluation of the development plan."

The ordinance then provides:

"In reviewing the application, the *Department shall consider the standards and purposes of the R-H Zone regulations with a view to achieving a maximum of coordination between the proposed development and the surrounding uses,* the conservation of woodland and the protection of water courses from erosion and siltation, and a maximum of safety, convenience and amenity for the residents of the apartments within the development. To these ends the Department shall consider the location of buildings, parking areas and other features with respect to the topography of the lot and existing natural features such as streams and large trees; the efficiency, adequacy, and safety of the proposed layout of internal streets and driveways; the adequacy and location of the green area provided, bearing in mind the possible effects of irregularly shaped lots, the adequacy, location, and screening of the parking lots; and such other matters as the Department may find to have a material bearing upon the stated standards and objectives of the R-H zone regulations." (Emphasis supplied).

It is further provided:

"All construction and development under any building permit shall be in accordance with the approved

site development plan. Any departure from such plan shall be cause for revocation of a building permit or denial of an occupancy permit. Any changes in an approved plan shall be resubmitted for approval in accordance with this subsection."

The applicants in the case at bar in addition to the usual form of application filed by "Jack Kay, et al," which gave a detailed metes and bounds description of the subject property, complied with these provisions of the new ordinance creating the R-H zone, and presented a plan of development prepared by W. L. Mayne and Associates, architect, Stein and Marcou, planners, Hammer and Company Associates, as economic consultants, and Hal Lackey as attorney. The plan is supported by a plot plan showing the location of the 7 high-rise apartments to contain a total of 1855 apartment units, and photographs indicating the general type of the proposed apartments. All of those who produced the proposed plan are well qualified and the proposed plan and the elaborate supporting data indicating the need for the proposed apartments, traffic conditions, effect on school facilities, the availability of shopping facilities, the financial and other advantages which will result to Montgomery County, and the like, show their competence.

After indicating that the proposal fits into and forwards the purposes of the R-H zone as set forth in the ordinance and a general description of the subject property, the project is described as follows:

"This project is planned to provide 7 buildings of 265 units each. Each building will be 15 stories high, will rise approximately 140 feet, and total building coverage is approximately 6.1%. It is also planned so that each building will face on generous landscaped areas and in no case will less than 400 feet separate the building faces. The windowless end walls are a minimum of 200 feet apart."

The detailed analysis of the proposed design indicates a total land area of 1,855,148 square feet. The allowed coverage of buildings under the ordinance is 8% or 148,412 square feet,

but each building has an actual coverage of 16,000 square feet or a total of 112,000 square feet, or substantially less than the allowable coverage. In regard to the coverage of the land, 45% coverage (834,817 square feet) is allowed, but the actual coverage totals 829,706 square feet allocated as follows:

| | |
|---|---|
| Buildings | 112,000 square feet |
| Drives | 226,380 square feet |
| Parking | 491,326 square feet |

The green area of 55% required by the ordinance is 1,020,331 square feet while the actual green area is 1,025,442 square feet, or more than is required.

The parking spaces total 2783, the number required by the ordinance (1855 apartment units x 1.5), of which 1811 are surface and 972 are underground spaces.

At the hearing before the County Council, the Planning Commission's report was submitted to the County Council. After reciting the nature of the application, prior applications and many of the facts already stated above, the Technical Staff reached the following conclusions:

"The previous Zoning Amendment Application C-509 involving the subject property was recommended for denial by the staff as it would have permitted a percentage of lot area to be covered by buildings, parking and other accessory uses which would not have been compatible with the surrounding single-family area. At that time the R-H zone was not available and the requested R-10 zone would, in the view of many, permit an undesirable type of multi-family development in this area. The staff suggested an R-20 classification which would have permitted an 8-story elevator-type apartment building, as additional yard setbacks were provided for each foot of height in excess of 45 feet. Subsequently, the Council denied the R-10 application and no further attempt was made on the part of the applicant to request R-20 zoning.

"Since C-509 was reviewed the District Council has adopted the R-H zone and the Preliminary General

Plan calls for multi-family classification on the subject property. The staff still believes the density permitted in this classification would add to the school problem in this area and increase traffic on local highways. However, the staff wishes to point out that the subject property is particularly well suited for multi-family use in that it is directly served by two major highways and one limited access expressway which can carry apartment traffic to all parts of the regional district without the necessity of routing this traffic through nearby single-family neighborhoods.

"In view of the recommendation contained in the General Plan and for the above reasons, the staff is inclined to recommend approval of this application with the exception of that area required for the widening of Colesville Road & University Boulevard."

The Planning Board, by the unanimous vote of the 4 members present recommended that the County Council approve the application in accordance with the recommendation of the Technical Staff. Also at the hearing, Hal Lackey, attorney for the applicants, presented the architect's rendering of the proposed plan, the study of the planners and the report of the economic consultants, all of which were made part of the record. George Spiegel and Carl E. St. Clair testified in protest against granting the application on behalf of a number of neighboring property owners, giving their reasons in opposition to the granting of the application. These witnesses, however, were not expert witnesses and no expert testimony was produced on behalf of the protestants. In the record are two books of signatures of property owners containing a total of 4921 names and there are additional petitions and letters of protest in the files. There is a book containing photographs showing houses in the area. The record also contains the proceedings in Application No. C-509 filed by Jack Kay and Ida Kay, his wife, and other named owners, on November 25, 1960, to change a portion of the subject property (34.74 acres) from a R-60 zone to a R-10 zone. These same owners' also filed Application No. C-508 at the same time, to change the remaining 8.49 acres from the

R-60 zone to the C-2 zone (General Commercial). These applications were denied by the County Council in 1961.

In submitting the application, the original was signed by Jack Kay and sworn to before Muriel B. Lackey whose notarial seal was duly affixed. Two copies were submitted by the applicant. One of these copies was submitted to the Planning Commission and contained a notarial seal of a notary public other than the one signing it.

The appellants make three contentions on this appeal:

1. The failure of the applicant to affix the correct notarial seal to the duplicate copy of the application invalidates the application.

2. The failure of the applicant to disclose fully all of the names of the owners of the subject property by using the words "Jack Kay, et al" as the owners in the application form invalidates the application.

3. There was no evidence of a mistake in original zoning or of a substantial change in the character of the neighborhood to justify rezoning under the Maryland Rule.

We will consider the first two technical objections together.

Section 104-33 of the Montgomery County Zoning Ordinance provides as follows:

> "All applications shall be subscribed by the applicant, shall state his name and address, and if the applicant is a person other than a governmental agency, *shall be verified under oath by the applicant.*" (Emphasis supplied).

Section 104-35 a (4) provides that the application shall include:

> "(4) The name and address of the owner of the land."

We think there is no merit to either of the technical objections.

As to the lack of the proper seal on the *copy* of the application sent to the Planning Commission, it is sufficient to observe that the Montgomery County Code does not require that any *copy* of the application be verified or carry a notarial seal.

As to the second objection, i.e., that *all* of the owners are

not listed in the application, but only the name of one, Jack Kay followed by the notation "et al", it should be noted that Jack Kay is one of the owners, holding a 7½% interest in the subject property. In the appellants' brief, the holdings in the subject property are considered and it is indicated that this information appeared in the land records of Montgomery County in Liber 2266, folio 546. The percentages of ownership ranged from 30% to 5%, with Jack Kay holding a 7½% interest as above indicated. This is a substantial interest and, as a co-owner of the subject property Jack Kay was authorized on his own behalf and on behalf of the other co-owners to file an application for the proposed rezoning. While it is perhaps the better practice to set out fully the names and address of all of the co-owners and to give their respective percentages of ownership, the provisions of the Montgomery County Code do not specifically require this, and the failure to give the names and addresses of all owners is not jurisdictional in any sense. Section 104-31 provides:

> "Proposals for amendment of the Zoning Ordinance Map may be made * * * by a person with a *financial, contractual or proprietary interest* in the property to be affected by the proposed amendment."
> (Emphasis supplied).

Mr. Kay's 7½% interest in the property gives him a proprietary and financial interest.

Then too, zoning ordinances are concerned with the use of property, the height of buildings and the density of population. They are not concerned with the *ownership* of the property involved and title to real property is not tried in zoning cases. The ownership of the subject property clearly appeared in the land records of Montgomery County and the appellants obviously had no difficulty in ascertaining who all of the owners were and in what proportions they held the subject property. There was obviously no prejudice to the appellants from not listing the names and addresses of all the owners. In our opinion there was substantial compliance by the applicant with the provisions of the Montgomery County Code and this is sufficient in a matter not involving jurisdictional requirements. As

our predecessors stated in *Heath v. Mayor and City Council of Baltimore,* 187 Md. 296, 299, 49 A. 2d 799 (1946) in regard to the objection that the sign posted on the premises was a pale gray instead of white as required by the applicable zoning rule:

> "Mere irregularities in an application to a board for a permit not amounting to a jurisdictional defect do not affect the validity of the permit. A substantial compliance with the requirements of an administrative regulation in making an application for a permit is sufficient."

The same observation is applicable here.

We conclude that both technical objections to the application are without merit.

We now consider the appellants' third contention, i.e., that there was no evidence of a mistake in original zoning or of a substantial change in the character of the neighborhood to justify rezoning under the Maryland Rule. In our opinion we need not consider this contention as the Maryland "change or mistake" rule is not applicable to the case at bar in view of the conclusion of the Technical Staff, adopted by the Planning Commission and the Council, that the applications complied with the purposes of the R-H Zone, and of our decisions in *Costello v. Sieling,* 223 Md. 24, 161 A. 2d 824 (1960) and in *Huff v. Board of Zoning Appeals,* 214 Md. 48, 133 A. 2d 83 (1957). In *MacDonald v. County Board,* 238 Md. 549, 210 A. 2d 325 (1965), the Planning Commission and its Technical Staff had recommended denial of the application because, in their opinions, the granting of the application, on the facts in that case, would constitute invidious spot zoning. The majority of the Council gave no reasons for their order approving the application. The Island of Thye Land Company, the applicant for the rezoning, in the court below and before us, relied upon claimed substantial changes in the area since the adoption of the comprehensive zoning map; the Court held that there was no substantial evidence to make the issue of alleged change of conditions fairly debatable. On the facts, the majority of the Court agreed with the Planning Council and its Technical Staff

that the proposed change involved piecemeal rezoning. In view of these holdings of the majority in *MacDonald, Costello* and *Huff* were not applicable; indeed, the application of these cases was not raised in the lower court or argued before us (although it was considered in Part II of the dissenting opinion, 238 Md. 566-575).

In the case now before us, the Planning Commission and its Technical Staff found that the proposal complied with the purposes of the R-H Zone, and the application of *Costello* and *Huff* was raised in the lower court and briefed and argued before us by counsel for both the applicants and the appellee. Counsel for the appellants attempted to distinguish *Costello* and *Huff* from the case at bar, while counsel for the appellee urged upon us that the decisions in those cases controlled the decision in this case. We have concluded that our decisions in the *Costello* and *Huff* cases do control the decision in the case at bar.

The new R-H zone, created on February 13, 1962, is a residential zone compatible with existing residential zones. It has some of the qualities of the so-called "floating zone." Professor Reno of the University of Maryland School of Law describes the "floating zone" as an example of "Non-Euclidean" zoning, in his interesting and instructive article in 23 Md. Law Review, 105 entitled, *"Non-Euclidean Zoning: The Use of the Floating Zone."* He points out that the floating zone, which is implemented by legislative action in the nature of a special exception, is a new concept in zoning and frees the legislative body from the shackles of the conventional "Euclidean zone" fixed as to definite areas. The validity of this type of "zone" has been the subject of litigation with differing results. In Pennsylvania, for example, the Supreme Court of Pennsylvania, held that this type of zone was not within the purview of the State Zoning Enabling Act. See *Eves v. Zoning Board of Adjustment of Lower Gwynedd Township,* 401 Pa. 211, 164 A. 2d 7 (1960). On the other hand, the Court of Appeals of New York sustained a floating zone permitting garden type of apartments, with adequate provisions for set backs, spacing of buildings and for a minimum 10.5 acre lot, upon application of an individual property owner and the approval of the Board.

See *Rodgers v. Village of Tarrytown,* 302 N.Y. 115, 96 N.E. 2d 731 (1951). We have approved the New York rule and followed and applied the decision in the *Rodgers* case in *Huff v. Board of Zoning Appeals,* 214 Md. 48, 133 A. 2d 83 (1957), *supra.* In *Huff* it appeared that Baltimore County was rezoned with 12 fixed use districts—6 residential, 3 commercial and 3 industrial with 1 floating industrial use district "M-r"—Manufacturing Restricted—which provided for a minimum size lot of 5 acres, for lot coverage of not in excess of 25%, and to be restricted to light industrial uses which would not produce noise and odors and which would not be disturbing to adjacent residences. Permission to establish such a zone was granted (or refused) upon a petition filed by an individual property owner, with appropriate notice, etc. A property owner, owning 18 acres of land in a Residential Use District (R-6 for one and two family homes), applied for the rezoning of his land to M-R to erect a factory to manufacture electrical precision instruments for use in missiles. The application was approved by the Zoning Commissioner, the Planning Commission, the Board of Zoning Appeals and, on appeal, by the Circuit Court for Baltimore County. We affirmed, Judge Henderson dissenting. On the subject of spot zoning, Judge Hammond, for the majority of the Court said:

> "When a zoning ordinance or an amendment puts a small area in a zone different from that of the surrounding area, we have what may be called 'spot zoning', using the term in a descriptive sense. Such zoning may be invalid or valid. If it is an arbitrary and unreasonable devotion of the small area to a use inconsistent with the uses to which the rest of the district is restricted and made for the sole benefit of the private interests of the owner, it is invalid. *Cassel v. City of Baltimore,* 195 Md. 348, 355. On the other hand, if the zoning of the small parcel is in accord and in harmony with the comprehensive zoning plan and is done for the public good—that is, to serve one or more of the purposes of the enabling statute, and so bears a substantial relationship to the public health, safety, morals and general welfare, it is valid. *Offutt*

*v. Board of Zoning Appeals,* 204 Md. 551, 561; *Temmink v. Board of Zoning Appeals,* 205 Md. 489, 495; *Ellicott v. City of Baltimore,* 180 Md. 176, 183; *Cassel v. City of Baltimore, supra."* (p. 57 of 214 Md., p. 88 of 133 A. 2d).

In regard to whether the floating zone was compatible with the idea of a comprehensive zoning ordinance, Judge Hammond stated:

> "A zoning plan does not cease to be a comprehensive plan because it looks to reasonably foreseeable potential uses of land which cannot be precisely determined when the zoning is passed. In zoning of undeveloped areas, account can be taken of potential uses reasonably foreseeable, that is, as the Planning Commission put it, the undeveloped areas can be looked upon as a reservoir of future land uses." (p. 60 of 214 Md., p. 90 of 133 A. 2d).

We followed *Huff* and treated it as controlling in *Costello* by a unanimous court. In *Costello,* three zones called "Tourist Accommodation Districts" had been created. The T-1 district, among other uses, permitted "motels and tourist cabins and hotels." The T-2 district, among other uses, permitted a "trailer coach park." In the T-2 district a minimum lot area of 3 acres was required, a 50 foot set back for any trailer from a street or road, a 20 foot set back from any side line, and a 25 foot set back from a rear line. The lot coverage could not be more than 50% by trailer coaches or buildings. In 1959, the County Commissioners for Howard County upon the application of the contract purchaser of a 92 acre tract of land, zoned "R" (Residential) reclassified that tract to T-2. The tract in question was surrounded by properties devoted to residential and agricultural uses. The protestant owned an 878 acre farm, the principal improvements on which were located ½ mile from the southern end of the rezoned tract. In the proposal the applicants indicated that they would provide and maintain a water system, swimming pool, an auditorium and an administration building, with a fountain and a loggia for adornment. There was testimony that existing trailer parks were inadequate to meet the

needs of the community but this was contradicted by the owners of two large trailer park areas. The expert testimony indicated, with one exception, that the establishment of the trailer park would not adversely affect surrounding properties. The Planning Commission of Howard County *recommended denial* of the application on the grounds that there would be an undue concentration of occupants in a small area, it would create a greater demand for community facilities than would be required for the normal half-acre residential development, there would be major sewerage and water supply problems and the original zoning was much more desirable on the tract. The County Commissioners *approved* the reclassification, noting that the use was closely related to residential use, there was a need for the new trailer park, the surrounding properties, save one, would not be adversely affected and there would be no undue demand for county facilities. The Circuit Court, on appeal *reversed* on the grounds 1) that the T-2 classification was not analogous to a special exception as in *Huff* and 2) there was no substantial evidence before the County Commissioners that there was either a mistake in the original zoning or of a substantial change in the character of the neighborhood. We reversed, holding that *Huff* controlled and that the "mistake-change in conditions" rule was not applicable.

Judge Horney, for the Court, stated:

> "As to the principal questions, we think the principles enunciated by Judge Hammond for this Court in *Huff v. Board of Zoning Appeals,* 214 Md. 48, 133 A. 2d 83 (1957), are controlling here in that the granting of the trailer park classification was somewhat analogous to a special exception when applied to a former residential zone. Moreover, since the trailer park is also residential in character, it appears that the reclassification is neither incompatible nor ,inconsistent with the remainder of the areas in the residential district. In these circumstances, the questions of mistake and change are not controlling." (p. 29 of 223 Md., p. 826 of 161 A. 2d).

In regard to locating the trailer park in the residential zones, Judge Horney stated:

"As to the propriety of locating T-2 areas in residential zones, it is apparent, since there was no unzoned land in the county, that the T-1 and T-2 zones must be carved out of some land use district or districts originally zoned for other purposes. Under these circumstances, there is no doubt that if the area selected serves a public rather than a strictly private purpose, so as to exclude it from the category of illegal 'spot zoning,' and is also such that it is fairly debatable whether it is appropriate as a place for the new use, so that the placement cannot be deemed to be arbitrary or capricious, then the rezoning should be upheld. Moreover, since the amended zoning regulations did not limit the location of a T-2 zone—or a T-1 zone either for that matter—to areas formerly zoned residential, the same rules as to debatability and legislative whimsicalness are likewise applicable to the placement of trailer parks in other zones. Indeed it appears that six out of seven areas zoned T-2 since the creation of the tourist accommodation classifications have been in M-1 and M-2 zones as was formerly required, but the presumption is that such placements met the required tests.

"We are not persuaded by the argument of the protestant that the differences between the other classifications, especially the residential ones, and the newly created tourist accommodation zones, were so slight that the distinctions were meaningless. Keeping in mind the fact that the tourist accommodation zones under attack do no more than substitute an unconventional type of housing for the conventional types usually found in a given community, we think it is clear that only slight distinctions or gradations—if indeed any were needed other than the specially required planning of the design, layout and roads—in the specified standards were necessary in order to establish a tourist accommodation use within the confines of any other zone." (p. 32 of 223 Md., p. 827-828 of 161 A. 2d).

As in *Costello*, the R-H zones must necessarily be carved out of districts already zoned for other purposes. In the ordinance creating the R-H zone it is legislatively determined that the newly created R-H zone is compatible with existing residential zones. In the "purposes" of the new R-H zone appears the following recitation:

> "* * * to prevent detrimental effects to the use or development of adjacent properties or the general neighborhood * * *"

One of the uses permitted as of right is "dwellings, one-family detached," clearly indicating compatibility with the R-60 zone.

In reviewing the application, "the Department *shall* consider the standards and purposes of the R-H zone with a view of achieving a maximum of coordination between the proposed development and the surrounding areas * * *" (emphasis supplied).

It is clear also that Section 104-13A of the Montgomery County Code requiring a detailed plan of development, its approval by the Department and its performance by the applicant after approval, is analogous to special exception provisions. The regulations are similar to those involved in both *Costello* and *Huff*, and our decisions in these cases require an affirmance in this case without regard to the Maryland "change-mistake" Rule.

It may be added that neither *Huff* nor *Costello* has been overruled or modified by our subsequent opinions. Both cases have been distinguished from the situation arising in Baltimore County in regard to action by the County Board of Appeals in reclassifying land from R-6 (residential, one or two family) to R-A (residential, apartment). See *Shadynook Improvement Association v. Molloy*, 232 Md. 265, 192 A. 2d 502 (1963), *Levy v. Seven Slade, Inc.*, 234 Md. 145, 198 A. 2d 267 (1964), and *Rohde v. County Board*, 234 Md. 259, 199 A. 2d 216 (1964). Chief Judge Brune for the Court in *Rohde, supra*, pointed out the distinction as follows:

> "The appellants also charge that the rezoning is bad as spot zoning and that there was no sufficient evidence

of mistake in original zoning or of change in conditions as to warrant reclassification. They also lay stress on the fact, which is conceded, that the property can be used under its R-6 classification. That alone is not, however, an absolute bar to reclassification. Zoning is not static. *Missouri Realty, Inc. v. Ramer, supra,* 216 Md. at 447. It is nevertheless, necessary to show error in original zoning or in its equivalent, comprehensive rezoning, or a subsequent change in conditions, although the change in classification be from one residential use to another (*Reese v. Mandel,* 224 Md. 121, 167 A. 2d 111; *Levy v. Seven Slade, Inc.,* 234 Md. 145, 198 A. 2d 267), unless the Legislature has indicated that the new classification and the classification of neighboring property are compatible. See *Huff v. Board of Zoning Appeals,* 214 Md. 48, 57, 133 A. 2d 83, where such a new classification was analogized to a special exception, and *Costello v. Sieling,* 223 Md. 24, 161 A. 2d 824, where a new classification of a residential nature was superimposed upon existing residential classifications and *Huff* was followed; and see the comment on these cases in *Overton v. Board of County Comm'rs. of Prince George's County,* 223 Md. 141, 150, 162 A. 2d 457." (pp. 266 and 267 of 234 Md., p. 220 of 199 A. 2d). This distinction is also suggested by Professor Reno at pages 118-119 of 23 Md. Law Review.

*Overton v. Board of County Commissioners of Prince George's County,* 223 Md. 141, 162 A. 2d 457 (1960) involved a change from R-R to C-O (Commercial-office building) and did not involve the R-H zone involved in this case, or a zone similar to it. *Levitt v. Board of County Commissioners,* 233 Md. 186, 195 A. 2d 723 (1963) involved a change from R-R to C-I and likewise did not involve the R-H zone or a similar type zone. Also in the Baltimore County cases the R-A zone is not a floating zone like M-R and hence the holding in *Huff* was held to be inapplicable. In the case at bar, however, the local legislature has indicated that the new classification and

the classification of neighboring property are compatible, hence the holdings in *Costello* and *Huff* do apply and control the decision in the case at bar.

In addition to the distinctions which have been pointed out between this case and *MacDonald,* the factual situation there differed materially from that here presented. In the case at bar, there is an "island" of land completely surrounded by dual lane highways and entirely separated from the surrounding R-60 land. This situation did not exist in *MacDonald.*

> *Judgment affirmed, the appellants to pay the costs.*