552 A.2d 960

**ROCKVILLE CRUSHED STONE, INC.**

v.

**MONTGOMERY COUNTY, Maryland, et al.**

**No. 715, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Feb. 3, 1989.

Charles G. Dalrymple (Kathleen Sheehy, Elizabeth M. Hosford and Linowes and Blocher, on the brief) Silver Spring, for appellant.

William J. Chen, Jr. (John B. Walsh, Jr., on the brief), Rockville, for appellees, Boyds Civic Ass'n, et al.

Clyde H. Sorrell, Co. Atty. (A. Katherine Hart, Sr. Asst. Co. Atty., on the brief), Rockville, for appellee, Montgomery County.

E. Austin Carlin (C. Brian Carlin, on the brief), Bethesda, for appellees, Jonathan S. England and Devlin Lumber and Supply Corp.

Argued before MOYLAN, BISHOP and ROSALYN B. BELL, JJ.

BISHOP, Judge.

The appellant, Rockville Crushed Stone, Inc. (RCS) appeals from an order of the Circuit Court for Montgomery County (Miller, J.) which affirmed Resolution 10–1971 (the Resolution) enacted June 10, 1986 by the County Council for Montgomery County, Maryland, sitting as the District Council (the Council) for that portion of the Maryland–Washington Regional District (the District) located in Montgomery County, Maryland. The Resolution denied RCS's Zoning Application G–316 (the Application), which sought a zoning reclassification from the Rural, Rural Density Transfer, and R–200 zones to the Mineral Resource Recovery Zone ("MRRZ") of approximately 530 acres of RCS property (the "Property") located in Boyds Maryland. Appellant claims that the Council acted arbitrarily, capriciously, and illegally. We affirm the denial.

## I

### Statutory Framework

In Montgomery County there are two separate procedures under the county zoning ordinance, The Montgomery County Code, Montgomery County, Md. (1984) (the "Code"), by which a party can apply to operate a quarry in a zone which does not provide for such use as a matter of course. The first is to apply for a *special exception* under § 59–G–2.52 or 2.53 to operate in an area zoned as either Industrial (I) or Rural (R). The second is to apply for a *zoning reclassification* to the MRR Zone. Division 59–C–12. Which method is to be used is not the applicant's choice. The applicant would always rather proceed by way of a special exception under §§ 59–G–2.52 or 2.53 as the governmental controls are significantly fewer than they are in the MRRZ. *Compare* Code Chapter 38 (the general laws applicable to all quarries including those authorized as both a special exception and as an MRRZ) *with* §§ 59–C–12.5 thru 12.8 (additional constraints applicable to property re-

classified to the MRRZ).  The appropriate procedure by which an applicant for quarry operations at a particular site must proceed is determined by the area master plan with which the applicant must comply.  *See* § 59–C–12.1 (applies to the MRRZ) and § 59–G–1.21(a)(3) (applies to a special exception under §§ 59–G–2.52 or 2.53).  In the case *sub judice*, The Maryland–National Capital Park and Planning Commission approved and adopted Boyds Master Plan (1985) (the "Master Plan") required RCS to obtain a zoning reclassification to the MRRZ in order to conduct quarrying operations on the Property.  Therefore, this case involves a zoning reclassification to the MRRZ and not an application for a special exception.[1]

The process of reclassification to the MRRZ under Division 59–C–12 is in two phases:

*Phase I*—Division 59–C–12 authorizes reclassification to the MRRZ of those areas "indicated as appropriate on the approved and adopted Master Plan." § 59–C–12.2.  This designation as "appropriate" does not make the location so specified an MRRZ and the fact that an area has been so labeled does not require the District Council to approve an application for an MRRZ at the site labeled "appropriate".  *Boyds Civic Ass'n v. Montgomery County*, 309 Md. 683, 696, 526 A.2d 598 (1987).  This designation is merely a condition precedent to the filing of an application for reclassification to an MRRZ.  This Phase I process, having been the subject of a separate appeal to this Court, is not at issue in the case *sub judice;* therefore, we will not discuss it further.  *Boyds Civic Association v. Montgomery County*, No. 694 (Md.App. Jan. 1989) (upheld an amendment to the Master Plan by which the Council designated the property *sub judice* as appropriate for the MRRZ).

*Phase II*—Once an area has been designated as "appropriate" for an MRRZ on the Master Plan, then a party seeking

---

1.  For an example of cases involving applications for special exceptions see *Board of County Commissioners for Cecil County v. Holbrook*, 314 Md. 210, 550 A.2d 664 (1988); *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981).

the reclassification of that area to an MRRZ must file an application for "Zoning Reclassification", § 59–C–12.1, which is "in the nature of [an application for] a special exception." § 59–C–12.1. This application consists of a Development Plan and a Site Plan. § 59–C–12.8. The application is initially reviewed by the hearing examiner, § 59–D–1.5, and is finally approved or rejected by the Council, § 59–D–1.4.

Approval for the requested reclassification to the MRRZ may be given by the hearing examiner and the Council only if the application meets certain standards specified in the Montgomery County Code, §§ 59–C–12.1 thru 12.8. These standards are divided into five major groupings:

(i) The MRRZ *purposes* (the "Purposes") include, *inter alia:* "preservation of preemptive developement of land underlain by certain mineral resource deposits of current or future economic importance to the county and region ...[and] to ensure maximum protection to surrounding properties and the physical environment ...[;] because of potential adverse environmental impacts associated with resource extraction, processing, and transportation, application of the mineral resource zone should be limited to deposits that can be demonstrated to be a valuable resource within the Washington metropolitan region." § 59–C–12.1.

(ii) The MRRZ *development standards* (the "Development Standards") relate to: net lot area; percentage of lot coverage; front, side and rear yard requirements and lot width at the front street line; building height; and open space and green area requirements. Code § 59–C–12.52.

(iii) The MRRZ *special regulations* (the "Special Regulations") control: paving of access roads, fencing, signs, parking, exterior lighting, hours of operation, land reclamation plans, explosives, and safety. Code § 59–C–12.6.

(iv) The MRRZ *performance standards* (the "Performance Standards") regulate: siting of operational activities, minimization of visual effects, noise, vibration, dust, hydrological effects, and reclamation. Code § 59–C–12.6(j).

(v) Finally, the application must be "in substantial compliance with the duly approved and adopted general plan or approved and adopted master plans for the Maryland–Washington Regional District." § 59–C–12.1. That "approved and adopted master plan," the Boyds Master Plan, sets the following preconditions, *inter alia,* for approval of an MRR Zone:

> 1) All transportation of stone from the Boyds mineral resource extraction site shall be by rail only for the short term and long term.
>
> 2) A finding that County and region-wide benefits outweigh controlled community impacts. This analysis would include an examination on the following: (1) the general availability of diabase [2] or similar stone in the region; (2) the projected short-term and long-term cost of procuring the stone including hauling cost; (3) the need for the stone from a County-wide and region-wide perspective; (4) the demand for the use of diabase or similar stone in State and County road projects; (5) other relevant factors suitable for demonstrating the economic benefit for use of the stone and its need from a County-wide perspective; and (6) the impact of a quarry and haul traffic on Boyds and other affected areas.
>
> . . . .
>
> A staging element coordinating construction with the availability of an appropriately zoned site for receipt of the rail-hauled stone.

*Id.* at 28–29.

## II

### *The Floating Zone*

The MRRZ is considered a "floating zone", *Boyds Civic Ass'n v. Montgomery County,* 67 Md.App. 131, 134, 506 A.2d 675 (1986).

---

**2.** Diabase is a hard rock suitable for making both Portland cement and bituminous concrete.

A floating zone is differentiated from a so-called "Euclidean" zone, in that while the latter is a specific area defined by boundaries previously determined by the zoning authority, the former has no such defined boundaries and is said to "float" over the entire area of the district or zone where it may eventually be established.

The floating zone is different from the establishment of an Euclidean zone in that it is initiated on the instigation of a land owner within the district rather than that of the legislative body.

*Bigenho v. Montgomery County*, 248 Md. 386, 391, 237 A.2d 53 (1968). In other words:

"Floating zones" are a device permitting the establishment of tracts or parcels of land in a specialized use category in accord with the comprehensive plan, without predetermining the exact location by leaving that decision to future needs and demands of a community as they are recognized from time to time.

S. Abrams, Guide to Maryland Zoning Decisions, p. 69 (2nd ed. 1975).

The Court of Appeals, in the pioneering decision, *Huff v. Board of Zoning Appeals*, 214 Md. 48, 133 A.2d 83 (1957), established the legal criteria for a valid floating zone ordinance:

When a zoning ordinance or an amendment puts a small area in a zone different from that of the surrounding area, we have what may be called "spot zoning", using the term in a descriptive sense. Such zoning may be invalid or valid. If it is an arbitrary and unreasonable devotion of the small area to a use inconsistent with the uses to which the rest of the district is restricted and made for the sole benefit of the private interests of the owner, it is invalid. *Cassel v. City of Baltimore*, 195 Md. 348, 355, [73 A.2d 486 (1950)]. On the other hand, if the zoning of the small parcel is in accord and in harmony with the comprehensive zoning plan and is done for the public good—that is, to serve one or more of the purposes of the enabling statute, and so bears a substantial rela-

tionship to the public health, safety, morals and general welfare, it is valid. *Offutt v. Board of Zoning Appeals,* 204 Md. 551, 561 [105 A.2d 219 (1954)]; *Temmink v. Board of Zoning Appeals,* 205 Md. 489, 495 [109 A.2d 85 (1954)]; *Ellicott v. City of Baltimore,* 180 Md. 176, 183, [23 A.2d 649 (1942)]; *Cassel v. City of Baltimore, supra. Huff v. Board of Zoning Appeals,* 214 Md. 48, 57–60, 133 A.2d 83 (1957).

*Huff* and subsequent decisions have established that the "change or mistake" rule, normally applicable to rezoning of the standard Euclidean zone, is inapplicable to the floating zone. *Knudsen v. Montgomery County Council,* 241 Md. 436, 441, 217 A.2d 97 (1966). The Council need not find a change or mistake in the present zoning in order to grant a reclassification to the floating zone. In floating zone reclassification proceedings, "the vital and decisive determination by the District Council is whether the application complies with the expressed [statutory] purposes for which the accomplishment of this floating zone was established." *Aubinoe v. Lewis,* 250 Md. 645, 652–53, 244 A.2d 879 (1968). To insure that a particular reclassification has been made in furtherance of the expressed statutory purposes, this Court has held that the District Council's approval must be conditioned on the applicant's satisfying certain conditions which must be specified in the enabling statute.[3] *Floyd v. County Council of P.G. Co.,* 55 Md.App. 246, 259, 461 A.2d 76 (1983) (citing *Bigenho v. Montgomery County Council,* 248 Md. 386, 237 A.2d 53 (1968)); *Bujno v. Montgomery County Council,* 243 Md. 110, 220 A.2d 126 (1966). Also, the District Council must make an express finding "that the project is compatible with existing uses in the general

---

**3.** RCS contends that this implies that the inverse must also be true, that the satisfaction of the statutory requirements necessitates approval of the application. Montgomery County claimed, at oral argument, that the District Council retains the option to deny an application which satisfies all of the conditions and the purposes stated in the enabling statute. Because the Council concluded that RCS had not satisfied the purposes of the MRRZ, we do not reach this issue.

neighborhood." *Aubinoe v. Lewis,* 250 Md. 645, 653, 244 A.2d 879 (1968).

## III

### *Facts*

The hearing examiner, as part of an excellent written recommendation to the Council, made the following findings of fact which were adopted by the District Council and which RCS does not dispute:

### 1. *General Description*

The subject property constitutes about one-sixth of the entire Boyds planning area. It is situated in a community that is very rural in character and manifests the lowest population density in the county. The site is under common ownership and is made up of several individual parcels that form a large irregularly shaped tract which is located southwest of the intersection of White Grounds Road and Maryland Route 117. The site possesses about 1,100 feet of frontage along White Grounds Road and extends west to Bucklodge Road, where it possesses about 900 feet of frontage. The northern perimeter of the site abuts the Baltimore and Ohio Railroad right-of-way.

. . . .

### 2. *Mineral Deposit*

The subject property and applicant's other holdings in the area comprise about 1,871 acres, which contain large deposits of diabase stone. Diabase makes excellent crushed stone due to its hardness, durability, and skid-resistant qualities. Crushed stone produced from the Boyds diabase rock can by used for all types of aggregate [including] skid-resistant aggregate [for highway construction],....The Boyds diabase has a polish value of 13 ... a measure of its hardness quality, which substantially exceeds the Federal Highway Administration specification of 8.5.

Most highway engineering experts believe that this hardness provides a skid-resistant quality that reduces highway accidents. For this reason, it is a requirement for federally funded highways ...

....

## B. The Surrounding Area

The surrounding area is rural and consists of farm land, woodland, scattered residential homes. The density reflects about 20 dwelling units per square mile and there are about 151 dwelling units within one mile of the subject property. The town of Boyds is located northeast of the ... property and is developed with homes, churches and a few commercial businesses within a very rural community....

....

## C. Development Plan

....

The applicant proposes to conduct an open quarry and crushing operation on the subject property that would extend over a 30–year period. Extraction activities would involve a 77–acre north quarry and a 31–acre south quarry, both of which would be extracted to a 300–foot depth.... Other activities of the site would include a processing plant, storage and rail loading facilities, all of which would comprise about 40 acres.

....

### a. *Haul Route*

The rail haul route currently involves two specific unloading locations, Site A, south of Gude Drive in Rockville, and a RCS facility at Bladensburg in Prince George's County.

....

RCS expects to exceed the minimum quantity shipment to Site A. In 1986, a shipment of 968,000 tons is project-

ed. In the year 2000, a shipment of 1,185,000 tons is projected. This means that 323 trains a year would unload at Site A and generate about 96,900 one-way truck trips in 1986. About 395 trains would unload at Site A and generate 118,500 one-way truck trips in the year 2000.

## D. Potential Benefits and Impacts

### 1. *Availability of Crushed Stone*

There are a number of locations of aggregate in the region and include sand and gravel, aggregate with a polish value in excess of 8.5, and aggregate with a lower polish value. The master plan map, reproduced on page 43 depicts 18 locations where aggregate with a polish value of 8.5 or more can be found: eight are located in Maryland, five are located in adjacent Virginia counties, and five are located in Pennsylvania.

An OMB analysis conducted for the master plan review process, Ex. 78, acknowledged that it is not possible to ascertain complete information about reserves and supplies in the region. The OMB study concluded that there was an adequate supply of aggregate in the region, although it is diminishing due to urbanization.

. . . .

### 2. *Cost of Procurement*

This factor is one of the most critical points in the case. The applicant claimed that lower prices would result from the opening of the Boyds quarry and this assumption provided a basis for projections of enormous savings to Montgomery County consumers and the release of large supplies of skid-resistant aggregate for highway projects. The increased use of skid-resistant aggregate by the SHA and DOT is predicated on the assumption that the commodity would be available to these public agencies at prices substantially lower than competitors.

. . . .

The OMB analysis rejected the notion that RCS would do otherwise than price to the market. Indeed, OMB concluded that RCS would not generally reduce prices "except for concrete aggregate and some surface course stone." Ex. 78, p. 22.

. . . .

The RCS pricing data is also flawed because its conclusions were not based on the proffered $1.70 per ton rate as they should have been. Mr. Lanham testified that his analysis was based on a rail rate of $1.70 per ton. However, he actually extrapolated Boyds prices based on a rail haul cost of $2.11 a ton, which assumed a rail tariff of $1.21 a ton. When the proffered $1.70 rate is applied as it must be, Genstar–Frederick prices reflect a price *advantage* instead of the price disadvantage projected.

### 3. *Regional Need*

In 1983, OMB reported that there was not evidence of need for the proposed quarry. . . . the special advantages attributable to the Boyds diabase rock reasonably relate only to about 42 percent of the total aggregate market and the unique skid-resistant characteristics relate only to a very small percentage of the total aggregate market.

. . . .

RCS predicted that it would produce about 1,700,000 tons at Boyds in 1986 and expand production each year so that by the year 2000 it would produce 4,610,000 tons.

. . . .

The Maryland SHA estimated a *three-year* need for skid-resistant aggregate for suburban Maryland counties (including Charles and St. Mary's Counties) at a level of 882,000 tons, or about ten percent of its total projected aggregate consumption. Ex. 39(i). The applicant estimated that DOT consumption would be about 100,000 tons annually because of lower prices. [total 982,000].

. . . .

The demand for diabase for state and county road projects constitutes an extremely small percentage in the

total market for crushed stone.... if a demand for Boyds diabase is shown, ... it would only justify a much smaller quarry. The bulk of RCS production at Boyds would compete for Portland cement concrete and other aggregate uses.

#### 4. *Demand for Use on County Roads*

There is an obvious demand for diabase or similar crushed stone in state and county road projects.

#### 5. *Other Relevant Factors Relating to Benefit and Need*

The OMB analysis indicated that the opening of the proposed quarry would provide an economic benefit to the county in terms of jobs, increased tax revenues and other indirect benefits.... The evidence does demonstrate the limited availability of unloading space between Gaithersburg and Rockville, and this space is likely to diminish as future development occurs.

#### 6. *Impact in Boyds and Other Affected Areas*

. . . .

The proposed quarry contemplates a massive operation that involves about one-sixth of the entire planning area. Its impact on the community would be significant, even assuming compliance with various laws and regulations.... [For example, even the legal levels of noise] would be heard by the community....

The hearing examiner also found that RCS had satisfied all of the statutory Development Standards, Special Regulations, and Performance Standards with the exception of the noise standards. He found that RCS had failed to present evidence on nighttime noise levels.

### IV

#### *The District Council's Conclusions*

In denying the application for a zoning reclassification the District Council concluded that:

The record clearly indicates that the proposed quarry would generate some regional and community detriments. Substantial truck traffic would be generated by the applicant's proposed unloading operation at Site A and the capacity of Derwood Circle to absorb this traffic is unknown. Nearby businesses contended that the traffic would be a detriment to the area. The proposed unloading operation constitutes a heavy industrial use which is not suitable for the location. The evidence also suggests that rail loading operations and other activities would be likely at the subject property during nighttime hours, and these activities would generate noise problems for the community. The proposed quarry would be a massive operation that would produce noise, vibrations, traffic and dust. *Even if these aspects of the quarry operation can be maintained within specified limits, the character of the Boyds community would be altered and, for that reason, quarry use has been made dependent on [the Master Plan requirement of] a clear showing of county-wide and regional benefits. The evidence does not permit an affirmative finding that these county-wide and regional benefits would exceed community detriments.* (emphasis added)

The Council adopted the following conclusion, made by the hearing examiner, on each of the factors which the Master Plan requires to be considered in determining whether the County wide and regional benefits of the quarry outweigh its controlled community impacts:

(1) Availability of diabase—"Crushed stone with a polish value meeting federal standards for skid-resistant aggregate is ...available although it is in periodic short supply. No attempt was made to quantify the scarcity. There are several existing sources in Maryland, northern Virginia, and Pennsylvania."

(2) Cost of procurement—"[I]t is ...uncertain that RCS would have any competitive price advantage over competitors [quarrying at other locations] with respect to total costs."

(3) Regional need for diabase—"[T]here appears to be adequate supplies [of diabase] and projected consumption levels do not indicate scarcity or consistent lack of availability."

(4) Demand for use on State and County roads—"The demand for diabase for state and county road projects constitutes an extremely small percentage in the total market for crushed stone....if a demand for Boyds diabase is shown, and that has not been the case, it would only justify a much smaller quarry."

(5) Other relevant factors relating to economic benefit and need—"[T]he opening of the proposed quarry would provide an economic benefit to the county in terms of jobs, increased tax revenues and other indirect benefits....Another factor ...involves the safety benefits of skid-resistant aggregate ..."

(6) Impact in Boyds and other affected areas—"The negative aspects of a quarry operation in Boyds have been documented by two master plans."

## V

### Standard of Judicial Review

The standard of judicial review of the District Council's decision in a floating zone case, as interpreted by this Court in *Kanfer v. Montgomery County Council*, 35 Md.App. 715, 730, 373 A.2d 5 (1977), is a two part test [4]:

On an appeal from the grant or denial by the legislative body of an application for a zoning reclassification, the function of the reviewing court in Maryland is indeed restricted and the "fairly debatable" rule is applicable.

---

**4.** This rule in effect strikes a compromise between the constitutionally mandated legislative discretion in performing the legislative function of zoning, *Germenko v. County Bd. of Appeals of Baltimore County*, 257 Md. 706, 711, 264 A.2d 825 (1970), and the constitutional limitations on the state's exercise of its police powers in enacting zoning ordinances, *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Cassel v. City of Baltimore*, 195 Md. 348, 355, 73 A.2d 486 (1950).

Otherwise stated, the appellate court may not substitute its judgment for that of the zoning body and should affirm when the latter's decision is [1] *supported by substantial evidence. Bosley v. Hospital for Consumptives*, 246 Md. 197, 204 [227 A.2d 746] ...(1967). ["Substantial evidence" means "a little more than a scintilla of evidence." *Montgomery County v. Gr. Colesville Ass'n*, 70 Md. App. 374, 382, 521 A.2d 770 (1987).] At the same time the Court of Appeals has consistently ruled that the denial of a zoning application may be reversed by an appellate court when the action appealed from is shown to be [2] *"arbitrary, capricious or illegal." Agneslane, Inc. v. Lucas*, 247 Md. 612, 619, 233 A.2d 757, 761 (1967); *County Council v. Gendleman*, 227 Md. 491, 498, 177 A.2d 687, 690 (1962).

*See also Floyd v. County Council of P.G. Co.*, 55 Md.App. 246, 258, 259, 461 A.2d 76 (1983).

RCS stipulates that the Council's first-level conclusions are supported by substantial evidence. They contend only that the Council's final denial of their application for a zoning reclassification was "arbitrary, capricious, ...[and] illegal", *Kanfer*, 35 Md.App. at 730, 373 A.2d 5; therefore, we need not consider whether the Council's decision is supported by substantial evidence.[5]

## VI

### *Discussion*

To insure that the proposed quarry furthers the purposes for the MRRZ, *Aubinoe v. Lewis*, 250 Md. at 652–653, 244 A.2d 879, Division 59–C–12 of the Code required the Council to find specifically that RCS satisfied both the standards specifically listed in the statute (the Development and Performance Standards and the Special Regulations) as well as those in the Master Plan. Despite the fact that the hearing

---

5. Our review of the record indicates that if this issue were before us we would find that there is substantial evidence to support the conclusions of the Council.

examiner's findings, which the Council adopted, noted that RCS had not satisfied the statutory requirements relating to night time noises [6] and traffic problems at Site A, the Council's conclusions, nevertheless, *presumed* that RCS had adequately satisfied all of the standards listed in the statute. The Council thereafter based their conclusion that the quarry would not further the purposes of Division 59–C–12, *Aubinoe v. Lewis*, 250 Md. at 652–653, 244 A.2d 879, solely on the bases that RCS did not satisfy the Master Plan requirement that a finding be made that the County and region-wide benefits, which RCS rightly calls "need", outweighed the controlled community impacts. Therefore, we must consider whether the Council's denial, based solely upon their determination that RCS failed to satisfy the master plan requirements, was arbitrary, capricious or illegal.

## A.   Arbitrary and Capricious

RCS contends that the District Council acted arbitrarily when they concluded that RCS failed to show that the need for the quarry outweighs its potential detrimental impacts on the "public health, safety ... and general welfare," *Huff*, 214 Md. at 60, 133 A.2d 83. RCS explains that the designation of the Property as "appropriate" for the floating zone usage, Phase I in our discussion, *supra*, created a "presumption", *Chatham Corp. v. Beltram*, 243 Md. 138, 220 A.2d 589 (1966); *Rockville Fuel v. Bd. of Appeals*, 257 Md. 183, 262 A.2d 499 (1970), that quarrying is compatible with the existing uses in the area and the Council's assumption that RCS satisfied the enumerated statutory standards means that the presumption was not overcome. Therefore,

---

**6.** The circuit court found that the hearing examiner had erred in finding insufficient evidence on night noises after the hearing examiner told RCS that he did not need to hear any further argument on the issue of noises because he was satisfied that RCS had met the statutory requirements in that area. The record, however, discloses that the examiner made this statement during closing arguments and not during the evidentiary phase of the hearing. If the evidence was not introduced by that point it would never be introduced, and we find no error based on the hearing examiners remarks.

RCS claims, "without adverse impact on the community, if *any* benefit from the proposed quarry could be shown, [such as the greater tax base or highway safety benefits found by the hearing examiner,] it would serve to balance the Benefits–Impacts Equation in favor of benefits."

In support of their claim that there exists a presumption of compatibility RCS cites the following passages from *Chatham* and *Rockville:*

A floating zone is a special use district of undetermined location, a district in which the proposed kind, location, size and form of structures must be preapproved, and which like a special exception use, is legislatively *pre-deemed compatible* with the areas in which it may thereafter be located on a particular application, provided specified standards are gratified and incompatibility is not revealed.

*Chatham Corp. v. Beltram,* 243 Md. at 149–159, 220 A.2d 589 (emphasis added) (This case did not involve a floating zone and the quoted passage is merely *dicta.*).

[P]art of ...[the] burden [of an applicant for a special exception] is not "to show affirmatively that his proposed use accords with the general welfare."

*Rockville Fuel v. Bd. of Appeals,* 257 Md. at 190, 262 A.2d 499.

These rules stated in both *Chatham* and *Rockville,* however, are inapplicable to the case *sub judice.* The presumption of compatibility discussed in these two cases applies only where: the final approving authority for the floating zone is an administrative body, *Huff,* 214 Md. at 61–62, 133 A.2d 83; the enabling statute mandates the presumption, *see Rockville,* 257 Md. at 190, 262 A.2d 499; or where the permit process is by way of a special exception, *Rockville,* 257 Md. at 190, 262 A.2d 499. We explain.

In *Huff,* the Court of Appeals, citing the landmark case of *Rodgers v. Village of Tarrytown,* 302 N.Y. 115, 96 N.E.2d 731 (1951), approved the use of the floating zone concept. *Huff,* itself, however, is considered an equally

important decision in the establishment of the floating zone concept. 2 Rohan, Zoning and Land Use Controls § 13.04[2] (1988). Whereas in *Rodgers* the final approving authority for the reclassification was the municipal legislative body, in *Huff* the final approving authority was an administrative board. In upholding the delegation of this authority to an administrative body against charges that the statute granted an unconstitutional delegation of legislative authority to an administrative body, 214 Md. at 61–62, 133 A.2d 83, the Court explained that the statute satisfied certain criteria. The Court held that, in addition to the criteria previously noted for a valid floating zone ordinance, that where the final approving authority in the floating zone reclassification process is an administrative body, the zoning ordinance must meet the additional requirements that: (1) standards must be specified in the enabling statute which control the agency's decision, and (2) the use which the administrative body is authorized to approve must be preordained by the legislature as presumed [7] proper for the surrounding area in which it is permitted. *Huff*, 214 Md. at 62, 133 A.2d 83. Where, however, as in Montgomery County, the final determining authority is a legislative body, *Kanfer v. Montgomery County Council*, 35 Md.App. 715, 730, 373 A.2d 5 (1977), and not an administrative agency, these additional standards do not apply, *Bar Harbour Shopping Center, Inc. v. Andrews*, 23 Misc.2d 894, 196 N.Y.S.2d 856, 867 (1959), because, unlike the situation in *Huff*, the constitutional problems associated with the delegation of legislative authority do not arise. *See Huff*, 214

---

7. The Court in *Huff* uses the phrase *prima facie* and not the word "presumed". As noted by this Court in, *Ristaino v. Flannery*, 76 Md.App. 662, 670, 547 A.2d 1115 (1988), the two terms are often used interchangeably but are not always synonymous. *Prima facie* in its proper form describes that amount of evidence which is sufficient to withstand a motion for judgment. The potential ambiguity in *Huff* is rectified by *Montgomery Co. v. Merlands Club*, 202 Md. 279, 287, 96 A.2d 261 (1953) (cited in *Huff*) which explains that this is actually a presumption.

Md. at 61–62, 133 A.2d 83.[8]

In *Rockville*, a case which involved an application for a special exception and not a reclassification to a floating zone, the Board of Zoning Appeals rejected the application because, the Board concluded, the proposed use was not in accord with the general welfare. The Court of Appeals reversed the Board and held that:

> Clearly the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements. *Board of County Comm'rs v. Luria*, 249 Md. 1, 3 [238 A.2d 108]. But as the Court said in *Bar Harbour Shopping Center, Inc. v. Andrews*, 196 N.Y.S.2d 856, 872, part of his burden is not "to show affirmatively that his proposed use accords with the general welfare."

257 Md. at 190, 262 A.2d 499. The Court's conclusion that there was no burden on the applicant for the special exception to produce evidence that the proposed use complied with the general public welfare is inapplicable to the case *sub judice* for two reasons. First, the "floating zone" is *"analogous* to the special exception," *Bigenho v. Montgomery County*, 248 Md. 386, 391, 237 A.2d 53 (1968) (emphasis added); *Costello v. Sieling*, 223 Md. 24, 29, 161 A.2d 824 (1960), but is not the *same* as a special exception, *Beall v. Montgomery County*, 240 Md. 77, 212 A.2d 751 (1965).[9]

---

**8.** While the presumption of compatibility is not applicable to this case, the record reflects that the hearing examiner did give RCS the benefit of such a presumption.

**9.** The distinction between the floating zone and the special exception of "special permit" has been explained as follows:

> The special permit is similar to the floating zone because in both cases a property owner must apply for specific approval to allow the use on his or her property. However, the courts have held that an ordinance authorizing special permits for specific uses does not create a floating zone. Such an ordinance merely adds an additional use in a mapped zone, but will not halt existing authorized uses in the zone. On the other hand, when the floating zone is finally located, it takes precedence over the previous zoning classification,

Unlike special exceptions, the presumption of compatibility is not warranted in the case of the floating zone because the legislature has not yet determined when or where the proposed use might be appropriate.

A second factor which renders the holding in *Rockville* inapplicable to the case *sub judice* is that the Court's conclusions in *Rockville,* as quoted above, are based on the fact that a specific statute mandated the presumption. *Rockville,* 257 Md. at 190, 262 A.2d 499; *Board of County Comm'rs v. Luria,* 249 Md. at 6, 238 A.2d 108 (cited for this proposition in *Rockville* ); *Bar Harbour Shopping Center Inc.,* 196 N.Y.S.2d at 872 (cited for this proposition in *Rockville* ). The statute *sub judice,* however, makes no such presumption. In fact, § 59–C–12.1 states:

> The fact that an applicant for the mineral resource recovery zone complies with all specific requirements and purposes set forth herein shall not be deemed to create a presumption that the resulting use and development would be compatible with surrounding land uses and, in itself, shall not be sufficient to require granting of the application.[10]

The statute *sub judice* actually presumes that the approval of an MRRZ will result in a certain amount of "adverse environmental impacts", § 59–C–12.1, which can at best be reduced to a level described in the statute as *"controlled* community impacts", Master Plan at p. 28 (emphasis added). The statute recognizes that large scale quarrying is always environmentally harmful but that in certain instances, now or in the future, the associated evils may become a practical

---

and the landowner may exercise only the uses authorized in the floating zone.
2 Rohan, Zoning and Land Use Controls § 13.02[2] (1988) (footnotes omitted).

**10.** This section does not grant the Council unbridled discretion in the zoning reclassification process. The Council must still insure that their final decision "is not arbitrary and unreasonable ... [and that the proposed use] is in accord ...with the comprehensive zoning plan, ...and serve[s] one or more of the purposes of the enabling statute." *Huff,* 214 Md. at 57, 133 A.2d 83.

necessity. For this reason the final location of these sites is restricted to "deposits that can be demonstrated to be a valuable resource within the Washington metropolitan region", *id*, to the extent that "region wide benefits outweigh controlled community impacts," Boyds Master Plan at 28.

Therefore, the proposed quarry is not presumed to be compatible with the Boyds area and RCS's burden was not merely to show some token benefit. Rather, RCS was required to present evidence sufficient to overcome a presumption of severe detriment to the area.

■ RCS contends that, even without a presumption of compatibility, it is clear that the Council concluded that RCS had satisfied the Master Plan requirements and that, despite these intermediate conclusions, the Council arbitrarily denied the application. As stated by RCS at oral argument, the Council "concluded in RCS's favor on every one of the Master Plan factors relating to need and then [arbitrarily] denied the permit for lack of need." This allegation is not supported by the record. The Council fully considered each of the six areas mandated by the Master Plan and made specific conclusions on each of these factors. The Council found in RCS's favor on only one of the six required areas of consideration mandated by the master plan and, consequently, we hold that the Council did not act arbitrarily and capriciously in denying the requested reclassification.

### B.  Illegal

■ RCS next disputes whether the Council can legally consider need as a factor in the application process. RCS cites the case of *Aspen Hill Venture v. Montgomery County*, 265 Md. 303, 289 A.2d 303 (1972), wherein the District Council denied a request to erect a business because, the Council found, there was an abundance of similar establishments in the area and there was no need for another. In reversing the District Council the Court noted:

> [W]here the lack of need is unaccompanied by any detriment to the public interest, should the application [for

rezoning] be granted, we cannot view the District Council's action [in denying the application on the basis of need] as amounting to anything more that its substituting an economic judgment of its own for that of the ... entrepreneur, as to the financial success of the venture.

*Id.* at 314, 289 A.2d 303. This reasoning is inapplicable to the present case for several reasons. Unlike the situation in *Aspen Hill,* there is a presumption in Division 59–C–12 that an MRRZ which complies with the statutory requirements will still cause a certain amount of detriment to the public interest. Consequently, need is not the only factor weighed as presumed detriment is a consideration which is statutorily factored into the process. Secondly, the statute in *Aspen Hill* did not specifically require the applicant to make a showing of need for the proposed use, *id.* at 313, 289 A.2d 303, as does the Boyds Master Plan. Finally, the required showing of need in the Boyds Master Plan is just one of numerous factors which the Council must consider.

RCS also argues that the Council illegally overemphasized the potential *economic* benefits of the proposed quarry when they were supposed to consider the five separate factors listed in the Master Plan in determining whether the benefits outweighed the controlled community impacts. As we stated *supra,* however, the record reflects that the Council fully considered each of the Master Plan factors. If economic need was given extraordinary consideration that is only because RCS was determined to make economic benefit the paramount consideration. The hearing examiner observed that the focus of RCS's evidence on the issue of need was related to RCS's contention that the new quarry would enable RCS to supply the Region with a significantly lower price on high grade diabase. RCS avoided the other issues which the Council was required by the Master Plan to consider and RCS's focus has not been altered by the appellate process. RCS seems oblivious to the Council's primary conclusion that there is no physical need in the region for additional sources of diabase, or any other aggregate, either now or in the foreseeable future. Instead, RCS

concentrates their attack on the Council's peripheral discussions regarding tax benefits, noise, traffic problems, etc.

Finally, RCS claims that the Council unlawfully considered the detrimental effects of traffic at Site A, which RCS claims was an improper consideration. We do not consider this allegation, however, because, as noted *supra*, the Council assumed full compliance with all requirements other than those relating to need.

In conclusion, we find that the Council's denial of the zoning application was not arbitrary, capricious, or illegal.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.