IN THE COURT OF APPEALS

7/15/97

OF THE

STATE OF MISSISSIPPI


NO. 94-CA-01176 COA



ARBOR STATION IV, L.L.C., AN ALABAMA

LIMITED LIABILITY COMPANY APPELLANT

v.

MICHAEL O. BREWER AND CONCERNED

CITIZENS OF LONG BEACH, MISSISSIPPI APPELLEE



THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B


TRIAL JUDGE: HON. KOSTA N. VLAHOS

COURT FROM WHICH APPEALED: HARRISON COUNTY CIRCUIT COURT

ATTORNEY FOR APPELLANT: GLENN F. RISHEL JR.

ATTORNEYS FOR APPELLEE: CHESTER ALLEN NICHOLSON

GAIL D. NICHOLSON

NATURE OF THE CASE: ZONING

TRIAL COURT DISPOSITION: CIRCUIT COURT OVERTURNED DECISION OF THE MAYOR AND BOARD OF ALDERMAN TO REZONE PROPERTY IN LONG BEACH, MISSISSIPPI

CERTIORARI FILED: 10/22/97

MANDATE ISSUED: 12/31/97

EN BANC.

McMILLIN, P.J., FOR THE COURT:

This case comes before the Court on appeal from the Circuit Court of Harrison County. The case came to that court as an appeal by a group of concerned property owners (hereafter referred to as "the protestors") from a decision by the City of Long Beach on a zoning matter. The Board of Aldermen voted to grant a zoning change affecting approximately twenty-three acres owned by Arbor Station IV, an Alabama limited liability company (hereafter "Arbor Station"), to permit a residential planned unit development for a multi-family housing project. The circuit court, sitting as an intermediate appeals court, determined that the protestors had been denied due process of law in the proceeding and remanded with instructions as to what additional steps would have to be taken before the Board could properly consider and act on the zoning change request.

Arbor Station perfected this appeal to the Mississippi Supreme Court and the matter was referred to this Court for decision.

I.

Preliminary Background

A.

Euclidian Zoning

Long Beach has a comprehensive zoning ordinance that classifies all property within the city into

various districts. These districts serve to restrict the use of property and the character of improvements that may be erected on a parcel depending on the zone in which the property lies. The ordinance is intended to provide some measure of stability in land use and promote the orderly development of property in accordance with an overall plan for the entire city. Such zoning regulation is permitted by state statute, which suggests such ordinances should be adopted "with a view to conserving the value of buildings, and encouraging the most appropriate use of land throughout such municipality." Miss. Code Ann. § 17-1-9 (1972); *See generally* Miss. Code Ann. §§ 17-1-1 to -39 (1972). The city's zoning ordinance, in its preamble, adopts similar language of intent and speaks of the adoption of a "comprehensive plan" for property utilization.

The city is physically divided by boundary lines into the various districts. The zones restrict property use to such activities as single-family housing, multi-family housing, several different commercial districts, and districts restricted to industrial activities. A map of the city delineating these areas is a part of the zoning ordinance. Such a geographic division is commonly referred to as "Euclidian zoning" in recognition of the United States Supreme Court case that approved zoning as

an appropriate exercise of the police power. *Village of Euclid v. Ambler Realty Co*., 272 U.S. 365 (1926).

B.

The "Floating" Planned Unit Development

However, the Long Beach ordinance contains a provision for another type of regulation of land use that is not within the contemplation of a traditional Euclidian zoning ordinance. Among the various zoning classifications in the ordinance is one for a "planned unit development." The concept of a planned unit development, though approved with adoption of the zoning ordinance, does not physically set aside in advance any particular portion of the city for such a development. Rather, the ordinance contemplates the establishment of such a zoning classification only after the developer makes application for approval of such a district for a particular parcel.

Unlike other zoning districts, a development district does not necessarily limit the affected property to a particular use or limited range of uses. It contemplates a mixed use of the property in accord with an overall plan of development that may include uses that cross the spectrum of possible activities. By way of example, under the Long Beach ordinance, a residential planned unit development permits a mixture of single-family housing and multi-family housing that would not normally be permitted to coexist in a Euclidian zoning district. The trade-off for this initial flexibility in use of the property is that, in order to gain approval from the zoning authority, the developer commits to a specific design for the development and is bound to develop the property in accordance with that plan. This gives the zoning authority substantially more control over the details of development than in a traditional Euclidian district. In a Euclidian district, the property owner chooses from a list of acceptable activities, and, so long as the property utilization is allowed within the general description of permitted activities under that zoning classification, the zoning authority may not interfere. Similarly, a property owner in a Euclidian zone may, without seeking permission of the zoning authority, change the use of his property from one permitted use to another. By way of

example, under the Long Beach ordinance, an owner of commercial property designated "C-1" may, as a matter of right, replace a medical laboratory with a motel development. However, once a planned unit development is approved, the various activities on the property are limited to those envisioned in the plan and may only be altered by a subsequent amendment to the development plan formally approved by the zoning authority under the procedure set out in the ordinance.

Because of the necessarily increased attention given to the plan of development, the property owner must, as a part of the application process, furnish substantially more detailed information concerning the proposed use of the property than in a traditional zoning change request. A review of the Long Beach ordinance confirms this fact, since it requires an involved application procedure that includes information about the project, a site development plan showing layout of improvements, architectural renderings of typical structures, utility access, street layout, location of common areas, landscaping plans, and proposed perimeter treatment. The ordinance refers to this application as "the preliminary development plan."

## II.

### Proceedings Before the Board

The scheme for amending the zoning map to create a planned unit development contemplates that there may be persons affected by the proposed change who are opposed to it. The ordinance requires the Board, as a part of its deliberation process once an application is filed, to publish notice and conduct a public hearing on the matter. One purpose of the public hearing is to permit those persons who oppose the change to be heard. In this case, a number of citizens, primarily owners of single-family residential property near the proposed project, organized to formally oppose approval of the project. These protesting landowners successfully pursued the original appeal to the circuit court and they are now the appellees before this Court.

The circuit court, in reversing and remanding the action of the Long Beach aldermen, did not reach the merits of the board's decision. Rather, the court concluded that Long Beach had not properly followed the procedural requirements of its own ordinance in approving the development and that, by its failure, the city had deprived the protestors of their due process right to mount a meaningful challenge to the proposed project. In particular, the circuit court said that the protestors

did not have sufficient notice informing them of the essence and the scope of the zoning change under consideration. The plans and documents available for view prior to the hearing did not conform to the procedural mandates of the appellee's zoning ordinance. As a result the appellants were prejudiced. They were not afforded sufficient due process to prepare and controvert the material facts and law bearing upon the issues governing the approval of PUDs [an unfortunate but widely-used acronym for a "planned unit development"].

This Court cannot agree with the circuit court on this point. We agree that property owners near a proposed project have some standing in the matter of the rezoning of property since the change affects their own property interests. *See Board of Supervisors v. Abide Bros.,* 231 So. 2d 483, 485

(Miss. 1970), *overruled in part on other grounds by Rosenbaum v. City of Meridian,* 246 So. 2d 539, 541 (Miss. 1971). It is also true that such rights have been discussed in terms of being "due process" rights. *Thrash v. Mayor and Comm'rs of Jackson,* 498 So. 2d 801, 808 (Miss. 1986). However, the Mississippi Supreme Court has made it clear that these due process rights of a protesting property owner are largely procedural, and that due process is satisfied by giving the protestor adequate notice of a hearing and the opportunity to be heard on the question in a meaningful way. *Thrash v. City of Jackson,* 498 So. 2d at 808. In this case, the protestors were properly notified of the public hearing on the application which the Board conducted on August 10, 1993. Opponents of the project appeared, both in person and through counsel, and were permitted wide latitude in presenting all information they deemed relevant on the question of the desirability of the project and its perceived adverse impact on them and on the community in general.

As to the proposition that the preliminary development plan was incomplete or deficient, and that this deprived the protestors of the opportunity to advance an informed and meaningful opposition to the project, we observe that the circuit court, in its brief order reversing the action of the board, made no findings of fact as to what particular deficiencies in the application the court found fatal or how such deficiencies prevented the protestors from presenting their opposition to the project. The protestors, in their brief to this Court, are equally unenlightening on the subject. Our review of the record convinces us that, at the time of the hearing, there was a substantial amount of information known to the protestors upon which to base their protest. We conclude that it was incumbent upon the protestors, who rely upon a claim that they lacked sufficient information to form a meaningful protest, to demonstrate to this Court in what particular aspect such information was lacking at the time of the public hearing and what impact the lack of that information had on the ability of the protestors to fairly present their views in opposition to the project. That has not been done.

It appears that the protestors and the circuit court may have put some weight on the fact that all of the information required by the ordinance may not have been on hand when the City's Planning Commission began its preliminary inquiry into the matter. This body acts solely in an advisory capacity to the Board. Our supreme court has noted that the primary purpose of the information supplied in the application process is to inform the governmental body responsible for the decision. It is that body's call, in the first instance, as to whether the information is sufficient to make a decision. "The procedural rules and regulations found in the City Zoning Ordinance are in aid of the City's performance of its legislative zoning function." *Id.* at 807. It is within the governmental body's authority to waive strict compliance with the application process so long as the information available is reasonably sufficient to permit an informed decision. *Id.* Thus, a protesting group has no particular standing to insist upon compliance with every detail of zoning ordinance application process. A protestor's standing to challenge on such a procedural ground would appear to be limited to those instances where the application is so deficient that it deprives an interested party of meaningful knowledge concerning the location of the affected property and a reasonably specific description of the intended use. In the view of this Court, the protesting appellees have failed to make such a showing. We, therefore, find that the circuit court was manifestly in error in concluding that the proceedings before the Long Beach Board of Aldermen were so procedurally flawed that the protestors were deprived of their due process rights.

III.

The Merits of the Board's Decision

Alternatively, the protestors argue that the Board abused its discretion in amending the zoning map for reasons unrelated to their procedural complaints. The protestors claim that, under Mississippi case law, there are only two circumstances when an amendment of a zoning district is permitted and that neither was established by Arbor Station. There is much authority in Mississippi that an existing zoning map may not be amended to change the zoning classification of a particular parcel unless (a) there was a mistake in the original zoning classification, or (b) there has been such a change in the property and the surrounding properties that the original classification is no longer appropriate. *See, e.g., City of Biloxi v. Hilbert,* 597 So. 2d 1276, 1280 (Miss. 1992)*; Faircloth v. Lyles,* 592 So. 2d 941, 943 (Miss. 1991)*; McWaters v. City of Biloxi,* 591 So. 2d 824, 827 (Miss. 1991). The protestors suggest that Arbor Station presented no credible evidence as to either proposition.

The idea of defining a zoning classification that, at the inception of the ordinance, has no physically assigned area is not a concept contemplated under earlier Euclidian zoning schemes. This new concept has been referred to as a "floating zone." *See* 2 *Robert M. Anderson, American Law of Zoning 3d § 11.06 (1986).* That treatise refers to such a concept as "a hybrid device which is intended to make the regulation of land uses more flexible . . . ." *Id.* Other states, in approving the concept as an alternate means of regulating land development, have concluded that the traditional requirement to change from one Euclidian zone to another (mistake in the original plan or change in neighborhood condition) does not apply to a proposed amendment to place a floating zone in a specific location on the zoning map. *See Beall v. Montgomery County Council*, 212 A.2d 751, 757-78 (Md. Ct. App. 1965); *Coleman v. Gormley*, 748 P.2d 361, 363 (Colo. Ct. App. 1987).

This view appears to have substantial merit. As we have already observed, a planned unit development is somewhat different and less open-ended than any other zoning classification. It contemplates a blend of land uses that can cross the spectrum of activity. It is more flexible in the planning stage yet, once approved, is substantially more rigid in the implementation stage. This Court can envision a proposed planned unit development that, in its major emphasis, was substantially in harmony with the existing zoning of the property and which, due to its design, would be entirely compatible with long-established uses of surrounding property. In such a case, the developer might be unable to show a mistake in the original zoning, since the intended use substantially reflects uses permitted under that zoning. The developer would also be unable to show any change in the neighborhood, since the proposed development, in its major thrust, was specifically intended to be in harmony with the existing surrounding property. Whether, in those circumstances, a zoning authority could be compelled to deny approval of the project because of the developer's admitted inability to show facts that no one contended to exist would not seem rational. Rather, it would appear that the proper inquiry ought to be whether the proposed development served the public interest as being in general accord with the comprehensive plan of development adopted by the governing authorities, so long as reasonable consideration was given to the adverse impact the project

would have on surrounding property owners. *See Woodland Hills Conservation Ass'n. v. City of Jackson,* 443 So. 2d 1173, 1179-80 (Miss. 1983).

We, therefore, hold that approval of a proposed planned unit development does not require, as a prerequisite to approval, a finding of either mistake in the original zoning classification or a subsequent change in character of the surrounding area. We conclude that the proper inquiry should be whether the project is in harmony with the comprehensive plan for the development of the city, giving proper consideration to the objections of affecting property owners and the impact such project would have on their properties.

In the case now before us, the Board found that there had been a change in the character of the affected property that made it more compatible with the proposed development. While such a finding was not a necessary prerequisite to approving the location of a "floating" planned unit development for the reasons we discussed above, nevertheless, such a finding does speak to the question of whether the project would conflict with nearby property owners' peaceful enjoyment of their property. The Board also found that the proposed project would serve the public interest. Concerns about the effect of the project on surrounding property owners were addressed in part by the establishment of undeveloped buffer areas. These areas were, in fact, expanded in the final plan at the urging of city officials. We find nothing of any substance in the record tending to show that the project as proposed would be unduly harmful to the protestors in their continued reasonable enjoyment of their properties.

IV.

The Limits of Judicial Review

It has been observed that the right to judicially interfere in legislative functions is strictly limited. *McWaters,* 591 So. 2d at 827. The judiciary may properly interfere with the legislative activity of a municipal corporation only when it is found to be arbitrary, capricious or unreasonable, or beyond the lawful authority of the body. *Faircloth,* 592 So. 2d at 943. If, as in this case, the decision is necessarily one which is vested in the discretion of the governmental body, we may not merely substitute our judgment for that of the board. Rather, we are obligated to affirm the action if the correctness of the decision is "fairly debatable." *Id.* This Court concludes that the city officials in this case properly considered the relevant factors in determining that this proposed project was in harmony with the city's overall plan of development. The protesting group has shown nothing of any substance that would tend to indicate this decision was arbitrary or capricious. Under the limited standard of review granted us, we conclude that the action of the Board of Aldermen of Long Beach in approving this planned unit development district was a proper exercise of its authority and was based upon sufficient relevant information to permit an informed decision. The decision to approve the project was, at a minimum, fairly debatable on this record. It was thus not so arbitrary, capricious, or unreasonable as to require this Court to intervene.

As noted earlier, we also conclude that there was substantial compliance with the various procedural aspects of the ordinance, especially those portions designed to protect the right of third parties such as these protestors to be heard. Therefore, no due process rights of any affected parties were violated in this proceeding.

For these reasons, we have determined that the circuit court's judgment must be reversed, and the

action of the Mayor and Board of Aldermen approving the zoning modification must be affirmed.

**THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS REVERSED AND RENDERED. COSTS ARE ASSESSED TO THE APPELLEES.**

**BRIDGES, C.J., COLEMAN, HERRING, HINKEBEIN, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR. THOMAS, P.J., AND DIAZ, J., NOT PARTICIPATING.**